**PATEL | STILWELL, LLP**
ANDREW R. STILWELL, ESQ.      (CBN: 229469)
3160 Camino Del Rio South, Suite 313
San Diego, CA 92108
Telephone: (619) 940-6623
Email: AStilwell@PatelStilwell.com

Attorneys for CYNTHIA HOLIDAY, Plaintiff.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA HOLIDAY,<br><br>Plaintiff,<br><br>vs.<br><br>BAYVIEW LOAN SERVICING, LLC, NATIONAL DEFAULT SERVICING CORPORATION, BANK OF NEW YORK MELLON, AS TRUSTEE FOR THE HOLDERS OF THE ALTERNATIVE LOAN TRUST 2005-76, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2005-76;<br><br>Defendant(s). | Case No.<br><br>COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF.<br><br>DEMAND FOR JURY TRIAL MADE |

CYNTHIA HOLIDAY (hereafter "Plaintiff) alleges as follows:

## JURISDICTION

**Federal Question Jurisdiction**

1.      Plaintiff asserts this Court's federal question jurisdiction, codified in 28 U.S.C. § 1331, on the basis that there are several questions arising under federal laws, including without limitation violations of the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et. seq.); Truth In Lending Act (15 U.S.C. §§ 1640-1641); Fair Credit Reporting Act (15 U.S.C. § 1681s-2), and the Internal Revenue Code

regulating Real Estate Mortgage Investment Conduit (BNY) Trust (26 U.S.C. §§ 860D, 860F, and 860G, as well as their corresponding Treasury Regulations).

**Diversity Jurisdiction**

2.      As a separate claim to, Plaintiff' assertion of federal question jurisdiction, Plaintiff asserts federal diversity jurisdiction on the basis that at each Defendant is jurisdictionally diverse from Plaintiff' California domicile, and the amount in controversy exceeds $75,000.00.

**Supplemental Jurisdiction**

3.      Additionally, Plaintiff also asserts this Court's supplemental jurisdiction over all issues of state law mentioned herein on the basis that those state issues arise from the same facts and circumstances as the acts alleged herein warranting federal jurisdiction over this Complaint.

<div align="center">VENUE</div>

4.      The United States District Court for the Northern District of California is the appropriate and proper venue for this action, on the basis that all contracts signed by Plaintiff and acts giving rise to a cause of action described herein were completed and committed in Santa Clara County, California.

<div align="center">PARTIES</div>

5.      Plaintiff is, and was at all times mentioned herein, an individual resident of Santa Clara County, California.

6.      Defendant BAYVIEW LOAN SERVICING, LLC ("BLS"), was at all times mentioned herein, a Limited Liability Company located at: 4425 Ponce De Leon Dr., Coral Gables, FL., 33146, (800) 457-5105.

7.      Defendant NATIONAL DEFAULT SERVICING CORPORATION ("NDSC") is located at 7720 N. 16th, St., #300, Phoenix, AZ., 85020 and at all times relevant was doing business in Santa Clara County California.

8.      Defendant BANK OF NEW YORK MELLON, AS TRUSTEE FOR THE HOLDERS OF THE ALTERNATIVE LOAN TRUST 2005-76,

MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2005-76 ("BNY"), is, and at all times herein mentioned was, a New York BNY (Real Estate Mortgage Investment Conduit) trust as defined by 26 U.S.C. § 860D, and its corresponding treasury regulations. At all times mentioned herein TRUST has maintained a principle place of business located at 614 West Main St., Suite 2600, Louisville, KY., also doing business at 400 Hope St., Suite 400, Los Angeles, CA., 90071.

9. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each Defendant designated herein is or was the agent, partner, employee, co-developer, joint-venturer, subcontractor, consultant, and/or supplier of each of the remaining Defendants, and was at all times herein mentioned, acting within the course and scope of said agency and employment.

10. Plaintiff is informed and believes and thereon alleges that the Defendants and each of them, and DOES 1 through 10, inclusive, were in some manner negligently or otherwise tortuously responsible for the events and happenings hereinafter alleged, and that each are vicariously liable for the acts of each other.

11. The true names and capacities of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said unknown Defendants, and each of them, by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to insert the true names and capacities of fictitiously named Defendants when same has been ascertained. Plaintiff is informed and believes and, based upon such information and belief alleges, that each Defendant herein designated as a "DOE" herein is legally responsible in some manner for the acts, occurrences, damages and liabilities hereinafter alleged, and actively and passively caused and contributed to the various injuries and damages referred to herein.

///

///

///

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**Plaintiff's Ownership Prior to the Loan Origination**

12.   On or before November 9th, 2005, Plaintiff acquired the real property located at 73-75 N. First St., Campbell, CA., 95008 (the "Property") via grant deed. The grant deed was recorded in the Santa Clara County Recorder's Office.

13.   The legal description for the Property is:

> All that certain real property situated in the city of Campbell, County of Santa Clara, State of California; Beginning at a point in the westerly line of first street, distant thereon 387 feet Northerly from the point of intersection thereof with the Northerly line of Campbell Ave.; thence Westerly at right angles and along the Southerly line of the parcel of and conveyed to William V. Dunham by Deed recorded November 11, 1905 in Book 299 of Deeds, pg. 492 and the Westerly prolongation thereof, 149.50 feet; thence Southerly at right angles 50 feet; thence Easterly at right angles 149.50 feet to said line of First St.; Thence Northerly along said line of First St. 50 feet to the point of beginning, and being a portion of the Southwest ¼ section 26 Township 7 South Range 1 West, M.D.B. and M.

14.   At all relevant times, Plaintiff has occupied the Property as their home and primary residence, and the Property consists of only one dwelling unit.

15.   At all relevant times, Plaintiff has been the fee simple owner of the Property.

**The Loan Origination**

16.   On November 9th, 2005, Plaintiff executed a secured promissory note ("Note"), and a deed of trust ("DoT"), which purported to secure the Note by the Property.  The DoT was recorded in the Santa Clara County Recorder's Office as document number 18682576 on November 18, 2005.  The DoT and the Note are hereafter jointly referred to as the "Mortgage."  The Mortgage was made only for personal, family, or household purposes.

17.     The parties to the DoT were Plaintiff, as Trustor, CTC FORECLOSURE SERVICES CORPORATION as trustee, the MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. ("MERS") as beneficiary, and AMERICA'S WHOLESALE LENDER ("AWL") as "Lender."

**Allegations Specific To MERS Common to All Causes of Action**

18.     Although MERS was described in the DoT as the "Beneficiary," the DoT limited MERS's authority solely as "Nominee" for the Lender.  California courts have routinely ruled that this designation as "Nominee" limits MERS's capacity to only actions taken within the scope of MERS's agency, and that MERS can only act at the direction of the Lender or their successors and assigns, those successors being contingent upon a writing by the original Lender that satisfies the Statute of Frauds for conveyances of real property.

19.     Further, MERS is a private company, and enters into "Nominee" relationships with lenders only through private contract.  Without such privity between MERS and the lender it is purporting to action on behalf of, MERS then has no authority to act on behalf of the lender under the DoT.

20.     AWL, however, was never licensed to do business in the State of California.

**Recording of the DoT Was Not a Privileged Communication**

21.     Plaintiff alleges that this recording was done by AWL without reasonable grounds to believe in the validity of the DoT because it was the product of an illegal table-funded loan originated and perpetrated by AWL against Plaintiff with reckless disregard for Plaintiff' rights or for the economic damage that the DoT would cause to Plaintiff' Property.  BNY, as the purported successor in interest to AWL, is liable for the prior acts of their predecessor.  Plaintiff therefore alleges that the recording of the DoT does not qualify as privileged publications under California Civil Code section 47 and is subject to the "malice" standard set forth under Cal. Civ. Code § 47 (c).

Attorneys at Law
San Diego, California

PATEL | STILWELL LLP

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

**The Deed of Trust**

22.     The DoT is a three-party contract, to which each party made certain covenants to each other, and which each party has standing to enforce against the others.

**A.     Transfer of the Note & DoT**

23.     Section 20 of the DoT states in pertinent part that:

> "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Agreement, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing."

24.     Expressed in this contractual agreement (DoT at Definitions-(H)- "Applicable Law"; ¶ 16-"Governing Law; Severability; Rules of Construction" and ¶ 20-"Sale of Note; Change of Loan Servicer; Notice of Grievance") to transfer the Note and DoT without prior notice is an agreement than any such transfer would not violate any federal or state law or regulation, or violate any pre-existing contract.  It was never Plaintiff's intention to authorize any un-noticed transfer of either the Note or the DoT, which would cause the transfer to violate any federal law, state law, federal regulation, state regulation, or pre-existing contract between the parties thereto or any of the parties and a third-party.

**B.     Notice of Intent to Accelerate**

25.     Section 22 of the DoT states in pertinent part:

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

"Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument …. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) the failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence."

**Table-Funding by Pass-Through Securitization**

26. From 2000 to 2010, lenders across the nation, including AWL, originated trillions in mortgage loans.  The ballistic ascent of the lending industry's ability to originate so many mortgages was primarily due to the ability to "securitize" the mortgages by privately held investment conduits that allowed them to draft their own underwriting guidelines.  No longer hindered by the rigors of federal agency underwriting guidelines, the lending industry could literally underwrite any type of loan they wanted, and they did.

27. "Securitization" is the process of pooling enormous amounts of capital for the purpose of funding mortgages through a third-party off-record transaction, which are held in special purpose entities ("SPE"), that supported the issuance of securities to the security markets for sale to the general public.  These

SPE's were utilized to anonymously fund mortgages through the mechanism of a "*surrogate originator*." Originators falsely held themselves out as the actual equitable lender to the borrower, but were, in fact, only straw-lenders written into the mortgage, but funding it through the anonymous, and wholly undisclosed to the Borrower, SPE's capital.

28. The originators would then instantaneously, equitably transfer the executed Note to the SPE to support the mortgage-backed security that had already been sold and issued (although the volume often slowed the paper documentation of the transfer), and the DoT would be recorded in the local county recorder's office and electronically transferred to MERS, who would act at the specific direction of the SPE without ever being an agent for the SPE.

29. Because the mortgages were pre-securitized by the SPE, they were never equitably owned by the *surrogate originator*, and the mortgages were never accounted for on the originator's balance sheet as an asset/liability because the originator never provided a scintilla of consideration for the transaction. The key indicator of these transactions would be the presence of a yield-spread premium paid to the originator for the use of its name and/or servicing income from the loan, which were routinely published on a publicly traded SPE's S.E.C. financial filings. AWL was a purported subsidiary of a publicly traded company, Countrywide Bank, F.S.B. that substantially acted as the *surrogate originator* for the massive SPE's that pre-funded the mortgage-backed bond market by "forward selling" the bonds. This act of "forward selling" is a trick used by Wall St. to sell AAA rated bonds without actually having an asset to back the bond. The money raised in the bond sales was placed into large warehouse facilities controlled by Wall St., which was earmarked solely for any upcoming potential home buyers through the network of *surrogate lenders*.

///

///

PATEL | STILWELL LLP
Attorneys at Law
San Diego, California

## Table Funding

30.     The process of posing as the *surrogate lender*, while actually performing as a broker and importing the funding to close a lending transaction is known as "table funding." The securitization process as described above is table-funding because the originator places their name (not their money) on the Note and DoT as the "Lender," when the mortgage was anonymously funded by the SPE's undisclosed warehouse facility.

31.     Although table-funding is legal for all *commercial* transactions in California, the Legislature specifically made encumbering residential property with table-funded loans illegal with the passage of AB 1203 in 1998, which became California Business and Professions Code § 10234.

32.     Plaintiff is informed and believes, and thereupon alleges, that AWL, as subsidiary of Countrywide Bank, F.S.B., while registered with the then California Department of Real Estate as a loan originator (Cal. B.R.E. License No. 00351782, now expired since 2008), and acting in that capacity, table-funded the Note herein by acting as the originator who anonymously funded the Note from a securitized SPE's warehouse facility.

33.     AWL then listed itself as "Lender" in the DoT, which purported to encumber a residential property, i.e. the Property, to the table-funded Note.

34.     AWL, with knowledge of California's ban on encumbering residential property with table-funded loans, did record the DoT in the Santa Clara County Recorder's Office on November 18, 2005, and illegally encumbered the Property in violation of Business and Professions Code § 10234 (d).

## The Deed of Trust is Void as an Illegal Contract

35.     The recording of the DoT on the Property was illegal and contrary to the expressed words of Business and Professions Code § 10234.

36.     By violating Business and Professions Code § 10234 the DoT became an illegal contract under California Civil Code §§ 1592 and 1608, because it was

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

the object and consideration to an illegal transaction. The DoT herein therefore became void on its recording date, which was November 18, 2005.

37. Therefore, the Mortgage has been unsecured since November 18, 2005, and without a valid security instrument on title, neither AWL, MERS, nor CTC, nor any of their successors or assigns, including Defendants NDSC, BNY, or BLS, have any authority to foreclose on the Property.

**Undisclosed Assignment of the Deed of Trust**

**Assignment 1 – MERS to BNY**

38. Despite the fact that the DoT has been a void nullity since November 18, 2005, on June 29, 2010, MERS executed an Assignment of Deed of Trust ("Assignment-1") purporting to assign the "all beneficial interest" in the DoT "together with the note(s) and obligations therein" to BANK OF NEW YORK MELLON, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC. ALTERNATIVE LOAN TRUST 2005-76, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2005-76 ("BNY"). The Assignment 1 was recorded on July 7, 2010 in the Santa Clara County Recorder's Office as document number 20766090.

39. The Assignment-1 was executed on June 29, 2010 by KEVIN RUDOLPH, at the direction of BNY, in his alleged capacity as "Assistant Secretary" to MERS. However, MERS executed the Assignment-1, not as nominee for AWL, but in its own individual capacity. The Assignment-1 specifically states that "the undersigned holder of the Deed of Trust...," and the signature block specifically states, "MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC." Nowhere does the Assignment-1 indicate that MERS is acting in its capacity as nominee for AWL, who is the *surrogate holder* of the interest being transferred for the undisclosed warehouse lender.

40. By 2009, COUNTRYWIDE and AWL no longer existed, and under California agency law, MERS's authority under AWL and COUNTRYWIDE

ceased to exist when COUNTRYWIDE finished its merger with BANK OF AMERICA, N.A. ("BANA") in late 2008. There is no indication within the Assignment-1 that BANA has any agency relationship with MERS, nor is MERS purporting to act on behalf of BANA, or even COUNTRYWIDE. MERS is, by its own admission in both the body and signature block of the Assignment-1, acting in its own capacity.

41.     California courts have uniformly held that MERS's authority to act under the DoT herein, and identical DoTs in other cases, is limited only to its agency capacity and at the direction of its principle. Since, there is no indication that MERS had any agency relationship with BANA at the time of the execution of the Assignment-1, and COUNTRYWIDE had been a non-existent entity for more than a year at the time, Plaintiff is informed and believes, and thereupon alleges that the Assignment-1 is void due to its signatory not having any authority or capacity to execute the document.

42.     Furthermore, Plaintiff alleges that the Assignment-1 is void, because it is attempting to assign something that does not exist. By the time the Assignment-1 is executed, the DoT had been void for over three (3) years. A void document is a legal nullity without any legal effect, and the assignment of which is also a legal nullity without any legal effect. Therefore, Plaintiff is informed and believes and thereupon alleges that the Assignment-1 is void, and failed to transfer anything to BAC.

**Assignment-2 – MERS to BNY**

43.     Despite the fact that the DoT has been a void nullity since November 11, 2005, on July 15, 2011, MERS executed an Assignment of Deed of Trust ("Assignment-2") purporting to assign the "all beneficial interest" in the DoT "together with the note(s) and obligations therein" to BNY…**a second time**. MERS executed the Assignment-2 in its individual capacity as described above

exactly under Assignment-1. The Assignment-2 was then recorded on July 19, 2011 in the Santa Clara County Recorder's Office as document number 21248533.

44. For all of the reasons set forth under the Assignment-1, Plaintiff alleges that the Assignment-2 is void (¶¶'s 38-42).

45. Further, by the time the Assignment-2 is executed, the DoT had now been void for over three (3) years. A void document is a legal nullity without any legal effect, and the assignment of which is also a legal nullity without any legal effect. Therefore, Plaintiff is informed and believes and thereupon alleges that the Assignment-2 is void, and failed to transfer anything to BNY.

46. Additionally, the BNY trust for whom BNY acts as Trustee is an entity of statutory creation and subject to the rules and regulations of the federal laws, including the Internal Revenue Code. The BNY trust closed, by operation of law, prior to the Assignments 1 and 2. The transfer of a mortgage, as an asset, to a BNY after its closing date violates 26 U.S.C. § 860D and F as a "prohibited transaction". The result of such a violation subjects all of the income of the BNY to 100% taxation, instead of its complete tax-fee status.

47. This transfer in violation of section 860D and F further subjects the certificate-holders to taxation and damages that Plaintiff can be subject to lawsuit as a party to the unlawfully conveyed DoT. This transfer violates federal law and regulations, and therefore violates the terms of the DoT in that Plaintiff did not agree to any transfers that violated any laws, regulations, or contractual obligations (i.e., the trust agreement with the BNY and its certificate-holders).

48. A third and final Assignment-3 was executed, again by MERS agent "BUD KAMYABI" on February 10, 2012, at the direction of BNY. The instrument was recorded at Santa Clara County Recorder's Office as Document No. 21537835.

///

///

Attorneys at Law
San Diego, California

PATEL | STILWELL LLP

49.     This Assignment-3 bears the exact same fatal deficiencies as the first two Assignments (1 and 2) and Plaintiff alleges that this final Assignment-3 is void for those same facts and reasons set forth in ¶¶'s 38-47.

**The Loan Servicing**

50.     Plaintiff is informed and believes that, at all relevant times, BLS has been the mortgage loan servicer, or successor servicer, of the Mortgage, a first-lien mortgage on the Property.

**The Loan Modification History**

51.     Beginning in the fall of 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners, including the Home Affordable Modification Program ("HAMP").

52.     As a mortgage servicer, BLS, and its predecessor(s) in interest, regularly conducted or managed loss mitigation and foreclosure of single family residences on behalf of entities that hold pools (i.e. trusts) of mortgage loans, including BNY.  Plaintiff is informed and believes, and thereupon alleges, that BNY does not participate in the HAMP program.  Investors who do not participate in HAMP offer loan modification assistance under private investor programs ("PIPs").

53.     For years, Plaintiff duly made her monthly payment for the Mortgage. While still current on the Mortgage, on or about June 16, 2015, Plaintiff requested a modification of the Mortgage from BLS' predecessor loan servicer, Select Portfolio Servicing, Inc. ("SPS").  Rather than properly review Plaintiff' requests, and acting with reckless disregard for Plaintiff' rights, SPS told Plaintiff that she had to default on the Mortgage and intentionally miss multiple months of payments on the Mortgage as a prerequisite to obtaining an affordable modification.

54.     Plaintiff is now informed and believes that those representations by SPS were false and SPS either knew the representations were false at the time they

were made or made the representations with reckless disregard for whether it was false.

55. In reliance on the representations, Plaintiff followed SPS's instructions and defaulted on the regular payments on the Mortgage.

56. Meanwhile, after stopping her payments as requested by SPS, Plaintiff duly, timely, and completely and **repeatedly** submitted all appropriate documentation to apply for a loan modification of the Mortgage. Plaintiff is informed and believes and thereupon alleges that SPS requested a HAMP modification of BNY, notwithstanding the fact that SPS knew that BNY did not participate in the HAMP program.

57. Further, Plaintiff is informed and believes and thereupon alleges that BLS requested a HAMP modification despite the fact that Plaintiff's unpaid principle balance on the Property exceeded the amount allowed under the HAMP guidelines. The HAMP guidelines are published and readily available to SPS, and Plaintiff therefore is informed and believes and thereby alleges that SPS had the disqualifying information at its fingertips and could have notified Plaintiff of her disqualifying status within minutes. However, instead, SPS drug the modification process on for years, constantly encouraging Plaintiff that at some point in time she would receive a modification.

58. Years went by, and Plaintiff kept on trying to modify the loan with SPS, and finally, on November 15, 2016, SPS suddenly transferred the loan servicing to Defendant BLS.

59. SPS had regularly "lost or misplaced" Plaintiff' paperwork, and made repeated requests for the same information, thereby causing further delay in Plaintiff's efforts related to her requested loan modification application.

60. SPS also made false representations to induce Plaintiff to enter into the loan modification. SPS represented that they were the servicer for the note holder, however the Note and DoT failed to be transferred to BNY as described

above. SPS represented that the "Property secures the loan," however, the DoT had been void for more than eight (8) years, and SPS knew or should have known that from a review of title. SPS represented that the "Borrower is in default of the Note and the Security Instrument," when they were the ones in default of the Note and Security Instrument by the illegal transfer to the BNY in violation of federal law and the transfer provisions within the DoT. Additionally, since the DoT was void, Plaintiff could not have been in default of something that does not exist or lacks legal meaning.

61. The anti-encumbrance provisions of Business & Professions Code section 10234 was lobbied for and presented to the legislature by the banking industry. The law was enrolled, and on public notice. Further, all of the evidence indicating the illegality of the DoT's encumbrance was public title record. BLS knew about its provisions, yet made these representations to BLS to induce Plaintiff to either enter into the unconscionable TMA or to break his will to modify.

62. Plaintiff spoke to BLS representative "RYAN FINNEGAN" on December 29, 2016, who verbally told Plaintiff that the loan modification from SPS had not been transferred to BLS and that she would have to repeat the last two fruitless years of document transfers.

63. By demeaning Plaintiff and demanding overtly impossible repayment terms, BLS hoped to avoid the additional 30-day right to appeal a servicer's rejection by causing Plaintiff to give up.

64. As a result, Plaintiff has not only been denied a fair and meaningful opportunity to obtain a modification of the Mortgage, but has been subjected to an unconscionable adhesion contract.

65. SPS's deal was no deal, and specifically intended to harm Plaintiff. BLS then acted with conscious disregard for Plaintiff and the emotional, financial, and physical harm it was causing to Plaintiff, and did not act in good faith by failing to apply the previous loan modification passed on to them by SPS.

66.    In reliance on BLS's representations, Plaintiff is informed and believes that BLS was providing mortgage modification assistance, and they continued to submit paperwork to BLS as requested with the expectation that BLS was applying for the appropriate loan modification program with BNY.

67.    BLS filed a Notice of Trustee Sale on May 5, 2017 without ever extending or offering a reasonable opportunity for Plaintiff to modify the loan.

**The Current Foreclosure Status**

68.    The power to sell a property through a non-judicial foreclosure is a contractual right granted to the trustee of a deed of trust, but the contractual power of sale is limited by a statutory non-judicial framework codified in Civil Code § 2924 et. seq.

69.    Under the statutory framework, non-judicial foreclosure is initiated by the execution and recording of a notice of default. Under the power of sale in the DoT, the lender or the beneficiary must provide Plaintiff, as a condition precedent to exercising the power of sale, with a notice of intent to accelerate 30 days prior to the execution or recording of a notice of default. The notice must also inform Plaintiff to her right a court action to assert the non-existence of a default or any other defense to acceleration. Neither BNY, BLS, NDSC nor MERS ever gave Plaintiff a 30-day notice of intent to accelerate or of a right to defenses and a court action. Without this notice, neither AWL, BLS, MERS, nor NDSC had any right, power, or authority to exercise the power of sale clause in the DoT.

70.    Further, the fact that the DoT itself was void as illegal meant that there was no power of sale in existence at the time any of the below described foreclosure acts took place.

**NDSC Illegally Files False Notice of Trustee Sale**

71.    On May 5, 2017, while the Mortgage was alleged to have been held by BNY, NDSC executed a Notice of Trustee Sale ("NoTS"), and recorded it in the Santa Clara County Recorder's Office. However, NDSC had never

demonstrated that a written "Declaration of Default and Demand For Sale" (as written in the NoD) had been received and/or reviewed by any person at NDSC. Without the execution of a written declaration of default and demand for sale, NDSC did not have the authority or power to execute or record the NoTS. Cal. Civil Code § 2924 requires that the NOD set forth only "the nature of each breach actually known to the beneficiary" (2924(a)(1)(D)) and rebuttable presumes that the beneficiary actually knew of all unpaid amounts owed to it.

72.     The filing of the NoTS placed the Property in a "distressed" status on title, and instantly caused a substantial decrease in the Property's value.

73.     Because of the notice of trustee sale, BNY, BLS and NDSC successfully kept Plaintiff's Property value depressed for years without any right, authority, or legal power to do so. Plaintiff is informed and believes and thereupon alleges that the continued filing of foreclosure documents by BLS, BNY and NDSC is part of a coordinated strategy to keep the Property's value depressed due to the "distressed" status in order to keep Plaintiff from being able to modify the Mortgage or sell the Property.

**The Notice of Default Is Void**

74.     On June 20, 2016, a Notice of Default ("NOD") was recorded as Instrument No. 23340600.

75.     Additionally, as stated above, the DoT itself had been void for more than six (6) years and, therefore, there was no power of sale for either BNY, BLS or NDSC to execute.

76.      The document was executed by "BRENDA MORRISON" as Trustee Sales Representative for NDSC at the direction of BNY and BLS jointly and/or severally.

77.     The document, at page 3, states that "…the present beneficiary under such deed of trust has executed and delivered to duly appointed Trustee a written Declaration of Default and Demand for Sale."

78.     The NOD relies solely and exclusively upon a power of sale derived from the Deed of Trust.

79.     There is no evidence in any record that a written declaration of default and demand for sale was ever executed, delivered or reviewed by each Defendant herein.  Upon information and belief, Plaintiff thereon alleges that no written declaration of default and demand for sale was ever executed by BLS or BNY and that Defendant NDSC acted without reasonable belief in the recitals contained in the NOD and in malicious and reckless disregard for Plaintiff's rights by failing to verify each and every fact contained in the NOD and by further failing to verify if the DoT was even a valid document.

80.     Without a valid substitution of trustee placing NDSC on title as the trustee to the DoT, or a valid assignment transferring the beneficial interest of the DoT to BNY, the recording of the NoD against the Property's title had created a cloud on the Property's title, and thereby has caused the Property's value to further significantly decrease.   Additionally, the filing of the NoD itself further "distressed" the status of the Property's title, and instantly caused another substantial decrease in the Property's value.

81.     Plaintiff is informed and believes and thereupon alleges that the continued filing of foreclosure documents by BLS, BNY and NDSC was part of a coordinated strategy to keep the Property's value depressed due to the "distressed" status in order to keep Plaintiff from being able to modify the Mortgage or sell the Property at its full value.

**No Privileges or Protections for Any Trustee or Its Principle Herein**

82.     Plaintiff alleges that each and every recording alleged herein above was done by the recording party without any reasonable grounds to believe that the recording party, or the party for which they acted on behalf, had the authority to file the documents recorded as above-alleged, and therefore executed and recorded the them, and each of them, with reckless disregard for Plaintiff' rights or for the

economic damage that each of them would cause to Plaintiff' Property. Plaintiff therefore alleges that the execution and recording of each of the above-described recorded documents do not qualify as privileged publications under California Civil Code §§ 47 and 2924.

83.   Additionally, since California Business and Professions Code § 10234 became effective in 1998, each of the recording parties, and the parties they were recording on behalf of, were aware of the law and the facts that rendered the DoT void and unenforceable.

84.   Yet, with that knowledge and notice, each of the above-described recorded documents was executed and recorded without any authority to do so under the void DoT. Therefore, any presumption normally granted by law by the filing of the foreclosure documents under Civil Code section 2924 et. seq. is thereby negated. Further, Plaintiff affirmatively refutes the raising of the § 2924 presumption, and objects to any of the above-described recorded documents being utilized as evidence of such presumption.

85.   Plaintiff further refutes either BNY's or NDSC's assertion of the presumption and protections of a foreclosure trustee under California law. NDSC filed the notice of trustee's sale at the direction of BLS and BNY, each without first satisfying the 30-day contractual condition precedent in the DoT, all without filing the mandatory prerequisite notice of default, and all without a valid DoT granting NDSC a valid power of sale. NDSC filed a notice of default and notice of trustee's sale without a valid substitution of trustee granting NDSC the authority to act under the DoT, and all of NDSC's recorded documents were executed and recorded without a valid assignment transferring the beneficial interests of the DoT to BNY or BLS, nor a valid DoT containing a valid power of sale clause. Therefore, NDSC is not protected by the presumptions and protections normally afforded foreclosure trustees. Further, NDSC was acting as a complete stranger to

the DoT, and is not protected by the presumptions and protections normally afforded foreclosure trustees.

**The Dual Tracking**

86.     At all times during the modification process, BNY and BLS never stopped the foreclosure process.

87.     All Defendants never rescinded the NoD, and always kept a pending foreclosure threatened against Plaintiff as recourse for not complying with the terms of the Modification Agreement.

88.     At all times during the modification process, should Plaintiff have failed to comply with the terms of the Modification Agreement, NDSC remained in a position where NDSC could perform a non-judicial trustee's sale immediately without notice.

89.     These circumstances made Plaintiff feel like she had a gun to her head, that she had no other choice but to take a deal she did not understand or lose her home.  Plaintiff alleges that because of this economic coercion and duress that she was denied a meaningful opportunity to acquire a loss mitigation program that is granted to her by California's Homeowner Bill of Rights.

**Tender**

90.     Within the entirety of this complaint, and as to all causes of action and factual allegations therein, Plaintiff is alleging that the Defendants herein, and each of them, never had any actual authority or right to execute or record the Assignments, the notice of default, or the notice of trustee's sale against the Property, nor to negotiate the Mortgage under color of foreclosure mitigation, due to a void DoT.  As such, where Plaintiff is challenging the authority to foreclose based on allegedly void documents, Plaintiff is not required to tender.

///

///

///

PATEL | STILWELL LLP
Attorneys at Law
San Diego, California

**Violation of the Fair Debt Collection Practices Act**
**(15 U.S.C. 1692 et. seq.)**

**Against BNY, BLS and NDSC**

91.     Plaintiff incorporates herein by this reference all prior allegations made herein above.

92.     Congress passed the Fair Debt Collection Practices Act ("FDCPA") in 1977 wherein 15 U.S.C. § 1692e stated purpose of eliminating "abusive debt collection practices," ensuring "that those debt collectors who refrain from using abuse debt collection practices are not competitively disadvantaged," and promoting "consistent State action to protect consumers against debt collection abuses."  In furtherance of these purposes, the FDCPA bans a variety of debt collection practices and allows individuals to sue offending debt collectors.

93.     The Note, which is included in the Mortgage, is a debt under the Fair Debt Collections Practices Act.

94.     NDSC is a debt collector under 15 U.S.C. § 1693a as it uses instrumentalities of interstate commerce or mails in any business the principle purpose of which is the collection of a debt and regularly collects or attempts to collect, directly or indirectly, debts owned or due or asserted to be owed or due to others, including AWL, then BNY, then BLS.

95.     BNY and BLS are both debt collectors under 15 U.S.C. § 1693a as each Defendant uses instrumentalities of interstate commerce or mails in any business, the principle purpose of which is the collection of a debt and regularly collects or attempts to collect, directly or indirectly, debts owned or due or asserted to be owed or due to others

96.     NDSC is not exempted from the FDCPA by its purported position as foreclosure trustee, because NDSC acted without any authority to do so, NDSC knew, or had a duty to know, that it had no authority to collect or act as an agent

for BNY and BLS, and therefore is not subject to any such protections normally provided to foreclosure trustees under California law.

97.     BNY is the principle to BLS, both of which stand joined in an agency relationship, and as such, BNY is vicariously liable for the acts that BLS took on BNY's behalf, while acting in the scope of that agency, which was the collection of the debt described in the Note.

98.     From November 2005 through 2008, AWL was the principle to CTC as Trustee under the DoT, both of which stand joined in an agency relationship, and as such, AWL, and its successors, is vicariously liable for the acts that CTC took on AWL's behalf, while acting in the scope of that agency, which was the collection of the debt described in the Note.

99.     From June 29, 2010 through current date, BNY was the principle to all loan servicers, all of whom stand joined in an agency relationship, and as such, BNY is vicariously liable for the acts that BLS and NDSC took on BNY's behalf, while acting in the scope of that agency, which was the collection of the debt described in the Note.

100.    Neither, BNY, BLS, or NDSC are the owner or creditor of the Note, nor do they have any ownership interest in the Property.

101.    BLS, at the direction of and on behalf of BNY did violate two provisions of the FDCPA, specifically 15 U.S.C. §§ 1692e and 1692f, in that (1) they used false, deceptive, or misleading representations or means in connection with the collection of the Note; and (2) they used unfair or unconscionable means to collect or attempt to collect a debt by (i) claiming that the mortgage is secured when it is not, (ii) claiming that the Property is subject to foreclosure when it is not, (iii) threatening to foreclose against the Property if payment is not made when they do not have a valid security interest in the Property to execute, (iv) filing of the NoD against the title of the Property when they had no authority to do so, (v) violating the California Homeowner Bill of Right's mandate that Plaintiff get a

meaningful opportunity to an available loan modification by utilizing high pressure coercive tactics to induce Plaintiff to execute the Permanent Modification that was filled with waivers and statements against Plaintiff' interests buried beneath pages of legal jargon while not affording Plaintiff an opportunity to get the advice of legal counsel; and (vi) violating the California Homeowner Bill of Rights, by failing to put a single point of contact that was authorized to grant Plaintiff an extension of time to get legal counsel.

102.   NDSC, at the direction of and on behalf of BNY and BLS did violate two provisions of the FDCPA, specifically 15 U.S.C. §§ 1692e and 1692f, in that (1) they used false, deceptive, or misleading representations or means in connection with the collection of the Note; and (2) they used unfair or unconscionable means to collect or attempt to collect a debt by (i) claiming that the mortgage is secured when it is not, (ii) claiming that the Property is subject to foreclosure when it is not, (iii) threatening to foreclose against the Property if payment is not made when they do not have a valid security interest in the Property to execute, (iv) filing of the NoD and notice of trustee's sale against the title of the Property when they had no authority to do so.

103.   Plaintiff has repeatedly disputed each defendant's claims that the Property is secured, yet BNY, BLS, and NDSC, and each of them, at the direction of and on behalf of BNY and BLS, continued their unauthorized, unfair, and unconscionable conduct against Plaintiff.

104.   BNY, BLS, and NDSC, and each of them, at the direction of and on behalf of BNY, unlawfully, unfairly, and unconscionably put the screws to Plaintiff, and as a direct and proximate result of BNY, BLS, and NDSC, and each of their acts at the direction of and on behalf of BNY, BLS, and NDSC, and each of them.  Plaintiff has sustained economic damage, including without limitation, the devaluation of the Property due to the filing of the NoD, notice of trustee sales,

the clouds put on the Property's title, and the horrible modification process, in an amount to be proven at trial.

<div align="center">

**CAUSE OF ACTION TWO**
**Violation of the Truth In Lending Act**
**(15 U.S.C. § 1641)**

**Against BLS and BNY**

</div>

105.   Plaintiff incorporates herein by this reference all prior allegations made herein above.

106.   15 U.S.C. § 1641, subd. (g) requires the recipient of a residential mortgage by assignment to notify the borrower in writing within thirty (30) days of when the loan was transferred.

107.   BNY, BLS, and each of them, have each asserted to Plaintiff, that they at one time or another as described herein was the recipient of the Mortgage by assignment.

108.   Yet, Plaintiff has never received any written notification from either BNY or BLS that the Mortgage was transferred to any of them as required under 15 U.S.C. § 1641(g), and therefore Plaintiff is informed and believes and thereupon alleges that BNY and BLS, and each of them, failed to notify Plaintiff that the Mortgage was transferred to them by assignment with thirty days of that transfer.

109.   During all times mentioned within this cause of action, Plaintiff has maintained the Property address as Plaintiff' mailing address, and has kept the Property as Plaintiff' primary residence.  There has not been any time during the times mentioned within this cause of action, where Plaintiff maintained any other mailing address for purposes of notice regarding the Mortgage.

110.   The Mortgage is a mortgage on a residential property within the scope of the Truth In Lending Act.

111.   As a direct and proximate result of BNY's and BLS' failure to notify Plaintiff of the assignment, Plaintiff has suffered actual damages, including

without limitation, the cost to hire of an attorney to find out the ownership status of the Mortgage, delinquency, and negative credit reporting in an amount to be proven at trial.

112.   BNY, BLS, and each of them, took specific action, including the non-disclosure described herein, to conceal the trust owner of the Mortgage, and therefore the applicable statute of limitations for this claim is tolled by BNY, BLS, and each of their, fraudulent and subversive conduct in keeping Plaintiff in the dark about their ownership of the Mortgage.

113.   Additionally, and as a separate measure of damages, BNY, BLS, and each of them, is liable for statutory damages equal to no less than $400.00 and not greater than $4,000.00 per violation.

114.   Plaintiff has incurred reasonable attorney's fees and costs in prosecuting this claim, and is entitled to an award of attorney's fees and cost therefrom.

<div align="center">

**CAUSE OF ACTION THREE**
**Violation of the California Rosenthal Act**
**(Cal. Civ. Code § 1788.1)**

**Against BAC, BANA, WOLF, RECONTRUST, BLS and BNY**

</div>

115.   Plaintiff incorporates herein by this reference all prior allegations made herein above.

116.   The California Rosenthal Act was enacted "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts. Section 1788.17 of the Rosenthal Act also includes violations of the FDCPA in a separate violation of state law.

117.   AWL, BNY, BLS and NDSC, and each of them, are "debt collectors" as defined by the Rosenthal Act because they both regularly, in the ordinary course

of its business, on behalf of themselves or others, including each other, engages in debt collection.

118. The Note herein is a debt as defined by the Rosenthal Act because the Note is money, property or their equivalent which is due and owing or alleged to be due or owing to AWL, then BNY, and NDSC, on behalf of and at BNY's direction.

119. Each Defendant herein did violate Rosenthal Act, in that (1) they used false, deceptive, or misleading representations or means in connection with the collection of the Note; and (2) they used unfair or unconscionable means to collect or attempt to collect a debt by (i) claiming that the mortgage is secured when it is not, (ii) claiming that the Property is subject to foreclosure when it is not, (iii) threatening to foreclose against the Property if payment is not made when they do not have a valid security interest in the Property to execute, (iv) filing of the NoD against the title of the Property when they had no authority to do so, (v) violating the California Homeowner Bill of Right's mandate that Plaintiff get a meaningful opportunity to an available loan modification by utilizing high pressure coercive tactics to induce Plaintiff to execute the Permanent Modification that was filled with waivers and statements against Plaintiff' interests buried beneath pages of legal jargon while not affording Plaintiff an opportunity to get the advice of legal counsel; and (vi) violating the California Homeowner Bill of Rights, by failing to put a single point of contact that was authorized to grant Plaintiff an extension of time to get legal counsel.

120. Plaintiff has repeatedly disputed each defendant's claims that the Property is secured, yet BNY, BLS and NDSC, and each of them, at the direction of and on behalf of BNY, continued their unauthorized, unfair, and unconscionable conduct against Plaintiff.

121. BNY, BLS and NDSC, and each of them, at the direction of and on behalf of BNY, unlawfully, unfairly, and unconscionably put the screws to

Plaintiff, and as a direct and proximate result of BNY, BLS and NDSC's conduct, Plaintiff has sustained economic damage, including without limitation, the devaluation of the Property due to the filing of the NoD, eight notices of trustee sales, the clouds put on the Property's title, and the horrible modification process, in an amount to be proven at trial.

<div align="center">

**CAUSE OF ACTION FOUR**
**Violation of the California Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200 et. seq.)**
**Against BNY, BLS and NDSC**

</div>

122.   Plaintiff incorporates herein by this reference all prior allegations made herein above.

123.   California's Unfair Competition Law ("UCL") may be brought by a person who has suffered injury in fact and has lost money or property as a result of unfair competition, which is defined as any "unlawful, unfair or fraudulent business act or practice" by California Business and Professions Code 17200.

**<u>Unlawful Acts by AWL For Which BNY Is Liable As Successor In Interest</u>**

124.   AWL violated California Business and Professions Code section 10234 by illegally encumbering residential real estate (the Property) with a table-funded mortgage after January 1, 1998.

125.   AWL caused a void instrument, the DoT herein, with full knowledge of its illegal character, to be recorded in the County Recorder's Office for Santa Clara County in violation of California Penal Code sections 115.5 and 532.

126.   By recording the illegal and void DoT, AWL also slandered the title to Plaintiff' Property.

127.   Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, AWL has violated the above described California laws and those violations are therefore per se violations of the UCL.

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

128.   Plaintiff alleges that AWL's misconduct, as alleged herein, gave, and have given, AWL an unfair competitive advantage over their competitors, and the scheme implemented by AWL as described herein is and was the result of unfair business practices designed to enrich AWL to the illegal detriment of Plaintiff.

129.   As a direct and proximate cause of AWL's illegal encumbering the Property with a table-funded mortgage, Plaintiff has been economically damaged including without limitation the devaluation of Plaintiff' Property by the void and illegal encumbrance the DoT creates on the title to the Property, the inhibition the encumbrance has caused Plaintiff in acquiring other lending secured by the Property, in an amount to be proven at trial.

130.   By reason of the foregoing, BNY, as successor in interest to AWL, has been unjustly enriched and should be required to disgorge its illicit profits and/or make restitution to Plaintiff, and/or be enjoined from continuing in such practices pursuant to California Business and Professions Code sections 17203 and 17204.

131.   The harm AWL has brought upon Plaintiff was done in the regular course of business for AWL, and has been suffered by thousands of California Homeowners.  The harm to Plaintiff, and other of the public, outweighs the utility to AWL's policy and practice, because these policies and practices constitute unlawful business practices or acts within the meaning of Business and Professions Code section 17200.  Further, the ongoing practice by BNY of enforcing illegally encumbered table-funding residential mortgages threatens an incipient violation of consumer laws, or violates the policy and spirit of such laws, significantly threatening competition in the residential lending industry in the state.

132.   AWL's and now BNY's unfair, unlawful, and fraudulent business practices of recording illegal deeds of trust, and placing void encumbrances on borrower's properties presents a continuing threat to members of the public in that other consumers will be defrauded into believing their loans are secured when they

are not, which will have a chilling effect on the borrower ability to acquire future and further secured lending against their property as they so desire.

133.   Plaintiff has no other adequate remedy of law, and is therefore entitled to injunctive relief and attorney's fees as available under the law.

**Unlawful Acts by MERS For Which BNY Is Liable As Successor In Interest**

134.   MERS violated the DoT by executing and attempting to assign the DoT to BNY in its own capacity.  The DoT states very clearly, three times, that MERS can only act on behalf of and at the direction of the Lender, and only in a "nominee" capacity.

135.   At the time of the Assignment 1, AWL/COUNTRYWIDE had been gone for three years, which destroyed MERS's authority to act on behalf of AWL because the principle to the agency relationship had in effect died or became corporately incapacitated.  MERS therefore did not have the authority or power to assign the DoT to BNY, or to execute it in MERS's own individual capacity, and the Assignment 1 was a breach of that contact.

136.   MERS caused a void instrument, the Assignment 1 herein, with full knowledge of its illegal character, to be recorded in the County Recorder's Office for Santa Clara County in violation of California Penal Code sections 115.5 and 532.

137.   By recording the illegal and void Assignment 1, MERS also slandered and clouded the title to Plaintiff' Property.

138.   Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, MERS has violated the above described California laws and recorded contracts, and those violations are therefore per se violations of the UCL.

139.   Plaintiff alleges the MERS's misconduct, as alleged herein, gave, and have given, MERS an unfair competitive advantage over their competitors, and the

scheme implemented by MERS as described herein is and was the result of unfair business practices designed to enrich MERS to the illegal detriment of Plaintiff.

140.   As a direct and proximate cause of MERS's illegal encumbering the Property with a table-funded mortgage, Plaintiff has been economically damaged including without limitation the devaluation of Plaintiff' Property by the void and illegal encumbrance the DoT creates on the title to the Property, the inhibition the encumbrance has caused Plaintiff in acquiring other lending secured by the Property, in an amount to be proven at trial.

141.   By reason of the foregoing, BNY, as successor in interest to MERS, has been unjustly enriched and should be required to disgorge its illicit profits and/or make restitution to Plaintiff, and/or be enjoined from continuing in such practices pursuant to California Business and Professions Code sections 17203 and 17204.

142.   The harm MERS has brought upon Plaintiff was done in the regular course of business for MERS, and has been suffered by thousands of California Homeowners.  The harm to Plaintiff, and other of the public, outweighs the utility to MERS's policy and practice, because these policies and practices constitute unlawful business practices or acts within the meaning of Business and Professions Code section 17200.  Further, the ongoing practice by BNY of enforcing illegally assigned residential mortgages threatens an incipient violation of consumer laws, or violates the policy and spirit of such laws, significantly threatening competition in the residential lending industry in the state.

143.   MERS', and now BNY's unfair, unlawful, and fraudulent business practices of recording illegal deeds of trust, and placing void encumbrances on borrower's properties presents a continuing threat to members of the public in that other consumers will be defrauded into believing their loans are secured when they are not, which will have a chilling effect on the borrower ability to acquire future and further secured lending against their property as they so desire.

144. Plaintiff has no other adequate remedy of law, and is therefore entitled to injunctive relief and attorney's fees as available under the law.

**Unlawful Acts by BNY**

145. BNY violated the DoT and California foreclosure laws by causing NDSC to execute and record a notice of trustee's sale against the Property's title without (1) satisfying the condition precedent to the exercise of the power of sale in the DoT; (2) recording the mandatorily prerequisite notice of default; and (3) having a valid DoT with a valid power of sale clause, in its attempts to foreclose on Plaintiff's Property.

146. BNY caused a void instrument, the NoTS herein, with full knowledge of their illegal character, and caused them to be recorded in the County Recorder's Office for Santa Clara County in violation of California Penal Code sections 115.5 and 532.

147. By recording the illegal and void notice of trustee's sale, BNY also slandered and clouded the title to Plaintiff' Property.

148. Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, BAC has violated the above described California laws and recorded contracts, and those violations are therefore per se violations of the UCL.

149. Plaintiff alleges that BNY's misconduct, as alleged herein, gave, and have given, BNY an unfair competitive advantage over their competitors, and the scheme implemented by BNY as described herein is and was the result of unfair business practices designed to enrich BNY to the illegal detriment of Plaintiff.

150. As a direct and proximate cause of BNY's recording of illegal notices of trustee's sale, Plaintiff has been economically damages including without limitation the devaluation of Plaintiff' Property by the void and illegal notices of trustee's sale creates on the title to the Property, the inhibition the notices of

trustee's sale have caused Plaintiff in acquiring other lending secured by the Property, in an amount to be proven at trial.

151. By reason of the foregoing, BNY, as successor in interest to AWL, has been unjustly enriched and should be required to disgorge its illicit profits and/or make restitution to Plaintiff, and/or be enjoined from continuing in such practices pursuant to California Business and Professions Code sections 17203 and 17204.

152. The harm BNY has brought upon Plaintiff was done in the regular course of business for BNY, and has been suffered by thousands of California Homeowners. The harm to Plaintiff, and other of the public, outweighs the utility to BNY's policy and practice, because these policies and practices constitute unlawful business practices or acts within the meaning of Business and Professions Code section 17200. Further, the ongoing practice by BNY of perpetuating the maintenance and recording of illegal notices of trustee's sale on people's homes threatens an incipient violation of consumer laws, or violates the policy and spirit of such laws, significantly threatening competition in the residential lending industry in the state.

153. AWL's and now BNY's unfair, unlawful, and fraudulent business practices of recording illegal deeds of trust, and placing void and illegal notices of trustee's sales on borrower's properties presents a continuing threat to members of the public in that other consumers will be defrauded into believing their loans are secured when they are not, which will have a chilling effect on the borrower ability to acquire future and further secured lending against their property as they so desire.

154. Plaintiff has no other adequate remedy of law, and is therefore entitled to injunctive relief and attorney's fees as available under the law.

///

///

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

**Unlawful Acts by NDSC For Which BNY Is Liable As Successor In Interest to AWL, and Principle to NDSC**

155.   NDSC violated the DoT and California foreclosure laws by executing and recording a notice of trustee's sale against the Property's title without (1) satisfying the condition precedent to the exercise of the power of sale in the DoT; (2) recording the mandatorily prerequisite notice of default; and (3) having a valid DoT with a valid power of sale clause, in its attempts to foreclose on Plaintiff's Property.

156.   NDSC caused a void instrument, the NoTS herein, with full knowledge of their illegal character, and caused them to be recorded in the County Recorder's Office for Santa Clara County in violation of California Penal Code sections 115.5 and 532.

157.   By recording the illegal and void notice of trustee's sale, NDSC also slandered and clouded the title to Plaintiff' Property.

158.   Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, NDSC has violated the above described California laws and recorded contracts, and those violations are therefore per se violations of the UCL.

159.   Plaintiff alleges the NDSC's misconduct, as alleged herein, gave, and have given, NDSC an unfair competitive advantage over their competitors, and the scheme implemented by NDSC as described herein is and was the result of unfair business practices designed to enrich NDSC to the illegal detriment of Plaintiff.

160.   As a direct and proximate cause of NDSC's recording of illegal notices of trustee's sale, Plaintiff has been economically damaged including without limitation the devaluation of Plaintiff' Property by the void and illegal notices of trustee's sale creates on the title to the Property, the inhibition the notices of trustee's sale have caused Plaintiff in acquiring other lending secured by the Property, in an amount to be proven at trial.

161.    By reason of the foregoing, BNY, as successor in interest to AWL and principle to NDSC, has been unjustly enriched and should be required to disgorge its illicit profits and/or make restitution to Plaintiff, and/or be enjoined from continuing in such practices pursuant to California Business and Professions Code sections 17203 and 17204.

162.    The harm NDSC has brought upon Plaintiff was done in the regular course of business for NDSC, and has been suffered by thousands of California Homeowners.  The harm to Plaintiff, and other of the public, outweighs the utility to NDSC's policy and practice, because these policies and practices constitute unlawful business practices or acts within the meaning of Business and Professions Code section 17200.  Further, the ongoing practice by BANA of perpetuating the maintenance and recording of illegal notices of trustee's sale on people's homes threatens an incipient violation of consumer laws, or violates the policy and spirit of such laws, significantly threatening competition in the residential lending industry in the state.

163.    NDSC's unfair, unlawful, and fraudulent business practices of recording illegal deeds of trust, and placing void and illegal notices of trustee's sales on borrower's properties, on behalf of BNY, presents a continuing threat to members of the public in that other consumers will be defrauded into believing their loans are secured when they are not, which will have a chilling effect on the borrower ability to acquire future and further secured lending against their property as they so desire.

Plaintiff has no other adequate remedy of law, and is therefore entitled to injunctive relief and attorney's fees as available under the law.

**Unlawful Acts of BNY**

164.    BNY violated the DoT and California foreclosure laws by causing NDSC to execute and record the NoD and notice of trustee's sale against the Property's title without (1) a validly executed or recorded substitution of trustee

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

replacing CTC with NDSC; (2) executing and recording a valid assignment transferring the DoT from AWL to BNY; OR (3) having a valid DoT with a valid power of sale clause, in its attempts to foreclose on Plaintiff's Property.

165. BNY caused five void instruments, the NoD, the Assignment 1-3 and the NoTS herein, with full knowledge of their illegal character, and caused them to be recorded in the County Recorder's Office for Santa Clara County in violation of California Penal Code sections 115.5 and 532.

166. By recording the five illegal and void recorded instruments, BNY also slandered and clouded the title to Plaintiff' Property.

167. Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, BNY has violated the above described California laws and recorded contracts, and those violations are therefore per se violations of the UCL.

168. Plaintiff alleges that BNY's misconduct, as alleged herein, gave, and have given, BNY an unfair competitive advantage over their competitors, and the scheme implemented by BNY as described herein is and was the result of unfair business practices designed to enrich BNY to the illegal detriment of Plaintiff.

169. As a direct and proximate cause of BNY's recording of illegal notices of default and trustee's sale, Plaintiff has been economically damages including without limitation the devaluation of Plaintiff' Property by the void and illegal notices of trustee's sale creates on the title to the Property, the inhibition the notices of trustee's sale have caused Plaintiff in acquiring other lending secured by the Property, in an amount to be proven at trial.

170. By reason of the foregoing, BNY has been unjustly enriched and should be required to disgorge its illicit profits and/or make restitution to Plaintiff, and/or be enjoined from continuing in such practices pursuant to California Business and Professions Code sections 17203 and 17204.

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

171.   The harm BNY has brought upon Plaintiff was done in the regular course of business for BNY, and has been suffered by thousands of California Homeowners.  The harm to Plaintiff, and other of the public, outweighs the utility to BNY's policy and practice, because these policies and practices constitute unlawful business practices or acts within the meaning of Business and Professions Code section 17200.  Further, the ongoing practice by BNY of perpetuating the maintenance and recording of illegal notices of default and trustee's sale on people's homes threatens an incipient violation of consumer laws, or violates the policy and spirit of such laws, significantly threatening competition in the residential lending industry in the state.

172.   BNY's unfair, unlawful, and fraudulent business practices of recording illegal deeds of trust, and placing void and illegal notices of trustee's sales on borrower's properties presents a continuing threat to members of the public in that other consumers will be defrauded into believing their loans are secured when they are not, which will have a chilling effect on the borrower ability to acquire future and further secured lending against their property as they so desire.

173.   Plaintiff has no other adequate remedy of law, and is therefore entitled to injunctive relief and attorney's fees as available under the law.

**Unlawful Practices by BLS**

174.   BLS violated California Civil Code section 2923.6 by failing to give Plaintiff a meaningful opportunity to acquire an available loan modification after January 1, 2013, in that BLS used coercive high-pressure tactics to induce Plaintiff to either enter into an unconscionable and adhesive loan modification or give up Plaintiff's attempts to modify the Mortgage.  BLS did this by failing to offer a reasonable opportunity to modify the loan, against Plaintiff's interest, and using degrading and coercive language for years.  BLS additionally was encouraging Plaintiff to allow them to help her refinance the Mortgage, while simultaneously

and continuously negatively reporting on her credit to ensure she never would receive a refinance.

175. BLS violated the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et. seq.) by attempting to collect a debt on behalf of BNY, all while knowing or having no reasonable grounds for believing that BNY was the owner of the debt. The debt was purportedly transferred to BNY after the official closing date of the BNY, which is a prohibited transaction under Internal Revenue Code section 860F (26 U.S.C. §860F) and its corresponding Treasury Regulations, and by law void. BLS was aware of the Internal Revenue Code describing such a transfer as a prohibited transaction, and therefore had no reason to believe that BNY was the owner of the debt that BLS attempted to collect upon on behalf of and at the direction of BNY. By proceeding in spite of this knowledge or lack of reasonable belief, BLS attempted to collect a debt under false and fraudulent pretenses to the detriment of Plaintiff, and in direct violation of the Federal Debt Collection Practices Act.

176. BLS violated the California Rosenthal Act (Cal. Civ. Code § 1877.1) by attempting to collect a debt on behalf of BNY, all while knowing or having no reasonable grounds for believing that BNY was not the owner of the debt. The debt was purportedly transferred to BNY after the official closing date of the REMIC, which is a prohibited transaction under Internal Revenue Code section 860F (26 U.S.C. §860F) and its corresponding Treasury Regulations, and by law void. BLS was aware of the Internal Revenue Code describing such a transfer as a prohibited transaction, and therefore had no reason to believe that BNY was the owner of the debt that BLS attempted to collect upon on behalf of and at the direction of BNY. By proceeding in spite of this knowledge or lack of reasonable belief, BLS attempted to collect a debt under false and fraudulent pretenses to the detriment of Plaintiff, and in direct violation of the Federal Debt Collection Practices Act.

177. BLS violated California Penal Code sections 518, 519, and 520 by extorting and/or exerting illegal economic coercion against, in that BLS used coercive high-pressure tactics to either induce Plaintiff into the loan modification loaded with waivers and statements against Plaintiff's interest degrading and coercive language, or induce Plaintiff to give up her efforts to modify the Mortgage. BLS additionally was encouraging Plaintiff to allow them to help her refinance the Mortgage, while simultaneously and continuously negatively reporting on her credit to ensure she never would receive a refinance. As BLS did not have authorization (due to a void DoT and BNY's failed transfer), BLS's attempt to collect a debt was illegal (violating the Fair Debt Collection Practices Act and the California Rosenthal Act), and therefore the coercion placed upon Plaintiff by BLS was illegal pressure and duress to the level of extortion and/or economic coercion.

178. BLS violated California Civil Code sections 1569 and 1570 by placing duress and exerting menace against Plaintiff, in that BLS used coercive high-pressure tactics to either induce Plaintiff into the loan modification loaded with waivers and statements against Plaintiff's interest degrading and coercive language, or induce Plaintiff to give up her efforts to modify the Mortgage. BLS additionally was encouraging Plaintiff to allow them to help her refinance the Mortgage, while simultaneously and continuously negatively reporting on her credit to ensure he never would receive a refinance. All the while, BLS was threatening to foreclose of the Property, when in fact they did not have the authority due to the void DoT and the failed assignment to BNY as plead herein. Plaintiff did not know at the time that the DoT was void, nor that BLS lacked the authority to foreclose, and BLS preyed upon Plaintiff's ignorance to place great coercive and illegal pressure against Plaintiff to induce Plaintiff to enter into the loan modification against Plaintiff's will or give up all together.

179. Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, BLS has violated the above described federal and state laws and those violations are therefore per se violations of the UCL.

180. Plaintiff alleges the BLS's misconduct, as alleged herein, gave, and have given, BLS an unfair competitive advantage over their competitors, and the scheme implemented by BLS as described herein is and was the result of unfair business practices designed to enrich BLS to the illegal detriment of Plaintiff.

181. As a direct and proximate cause of BLS's illegal acts, Plaintiff has been economically damaged in an amount to be proven at trial.

182. By reason of the foregoing, BLS has been unjustly enriched and should be required to disgorge its illicit profits and/or make restitution to Plaintiff, and/or be enjoined from continuing in such practices pursuant to California Business and Professions Code sections 17203 and 17204.

183. The harm BLS has brought upon Plaintiff was done in the regular course of business for BLS, and has been suffered by thousands of California Homeowners. The harm to Plaintiff, and other of the public, outweighs the utility to BLS's policy and practice, because these policies and practices constitute unlawful business practices or acts within the meaning of Business and Professions Code section 17200. Further, the ongoing practice by BLS of either inducing homeowners into loan modifications loaded with waivers and statements against their interest degrading and coercive language, or induce homeowners to give up their efforts to modify the Mortgage entirely, threatens an incipient violation of consumer laws, or violates the policy and spirit of such laws, significantly threatening competition in the residential lending industry in the state.

184. BLS's unfair, unlawful, and fraudulent business practices, as described above, presents a continuing threat to members of the public in that other consumers will be defrauded as Plaintiff has been, which will have a chilling effect

on the borrower ability to acquire future and further secured lending against their property as they so desire.

185. Plaintiff has no other adequate remedy of law, and is therefore entitled to injunctive relief and attorney's fees as available under the law.

**Unlawful Acts of BNY**

186. Plaintiff hereby incorporates fully by this reference all paragraphs herein to this section of this cause of action.

187. BNY is allegedly the successor in interest to the Mortgage, and although disputed by Plaintiff for the reasons stated herein above in this cause of action, and as pleading in the alternative, if BNY is determined to the be successor in interest to the Mortgage, then BNY assumes all responsibility as a successor in interest for its predecessors in interest, AWL, who violated California law multiple times as herein above described.

188. BNY is the principle to BLS, both of which stand joined in an agency relationship, and as such, BNY is vicariously liable for the acts of its agent, BLS, for the acts that BLS took on BNY's behalf, while acting in the scope of that agency, which was the collection of the debt described in the Note.

189. As a proximate cause of BNY's directing BLS's illegal actions against Plaintiff, and as a proximate cause of AWL's, illegal actions against Plaintiff, for which BNY is alternatively alleged to be responsible for a purported successor in interest to the Mortgage, Plaintiff has been economically injured, including without limitation, the devaluation of Plaintiff' Property by the illegal acts described herein above, in an amount to be proven at trial.

///

///

///

///

///

**Against BNY, BLS and NDSC**

190. Plaintiff hereby reincorporates all of the previously numbered paragraphs into this cause of action as if they were each individually pled herein.

## **Cancelation of Deed of Trust**

191. There are in existence the following certain written instrument which purports to be a Deed of Trust, purportedly securing the herein described Note to the herein described Property:

a. The deed of trust, dated November 9, 2005, between Plaintiff as "Borrower," AWL as "Lender," MERS as "Beneficiary," and CTC as "Trustee," which was recorded in the Santa Clara County Recorder's Office as document number 18682576 on November 18, 2005.

192. The form and contents of the DoT is as set out in the copy of which are attached to this complaint as **Exhibit A** and incorporated fully herein by reference.

193. The DoT is a three-party contract of which Plaintiff is an expressed party, and as such has standing to challenge the DoT.

194. The DoT encumbers California residential property to a table-funded mortgage in violation of California Business and Professions Code section 10234 as described herein above. The DoT is therefore the singular subject of an illegal transaction, and was given as illegal consideration under California Civil Code sections 1596 and 1608. The DoT is therefore void.

195. The DoT creates serious injury to Plaintiffs' title in her Property as it has placed a cloud on title, and a substantial encumbrance on the value of their Property. These void DoT is proximately causing diminution in value to the

PATEL | STILWELL LLP
Attorneys at Law
San Diego, California

Properties, as well as causing other damages in an amount and degree proven at trial.

196. Plaintiff seeks this Court's exercise of its equitable powers to confirm the DoT is void, cancelling the instrument as without any effect.

**Cancelation of the Assignments**

197. Plaintiff is an actual party to the three-party contract that is the DoT, and therefore has standing to enforce its provisions and subsequent transfers that violate the expressed wording or intention of the parties thereto.

198. The DoT contain provisions for the transfer of the DoT by the beneficiary. However, expressed within the DoT transfer provisions is a covenant that the beneficiary will not transfer the DoT in violation of any federal or state law, or in violation of any existing contract. The parties to the DoT are bound by statutory and common law in California not to violate any laws and not to interfere with any pre-existing contractual relationships.

199. There are in existence certain written instruments which purport to be Assignments of Deed of Trust as follows:

    a.  The Assignment-1, dated June 29, 2010, purporting to transfer the DoT from MERS to BNY, which was recorded on July 7, 2010 in the Santa Clara County Recorder as Document Number 20766090.

    b.  The Assignment-2, dated July 14, 2011, purporting to transfer the DoT from MERS to BNY, which was recorded on July 19, 2011 in the Santa Clara County Recorder as Document Number 21248533;

    c.  The Assignment-3, dated February 10, 2012, purporting to transfer the DoT from MERS to BNY, recorded on February 15, 2012 as Document No. 21537835.

Attorneys at Law
San Diego, California

COMPLAINT

200. The form and contents of the above-described assignments are as set out in the copy of it which is attached to this complaint as Exhibit B and incorporated by reference.

201. As described herein above, the assignments purport to transfer the void DoT in violation of California foreclosure and title laws and pre-existing DoT contract, in addition to being made without the authority to do so in the first place. Because of these violations, the assignments are void.

202. The Assignments 1-3 create serious injury to Plaintiff's title in her Property as they have placed a cloud on title, and an unauthorized stranger to the Mortgages in a place of creditor against Plaintiff. These void assignments are proximately causing diminution in value to the Property, as well as causing other damages in an amount and degree proven at trial.

203. Plaintiff seeks this Court's exercise of its equitable powers to confirm the above-described assignments are void, and cancelling the instruments as without any effect.

**Cancellation of Notice of Default**

204. There is in existence a certain written instrument which purports to be the NoD. The form and contents of the NoD are as set out in the copy of it which is attached to this complaint as Exhibit C and incorporated by reference.

205. On June 20, 2016, the NoD was recorded in the County Recorder's Office for Santa Clara County as Document No. 23340600.

206. The NoD was executed by NDSC who is not the authorized trustee under the DoT, because the DoT is void as illegal, and the Assignment to BNY is also void, and there was no valid substitution of trustee filed replacing CTC with NDSC as trustee under the DoT. NDSC was at all times regarding the NoD acting under the principle agent relationship between NDSC and BNY. BNY had no authority because the void DoT rendered the Note unsecured at the time of its recording, NDSC did not have the authority to execute and record the NoD, and

the Mortgage never transferred to BNY because the prohibited transaction stopped its transfer at its inception.

207. The NoD also contains a false statement that the trustee received a written declaration of default and demand for sale, when in fact the trustee never received such declaration and demand as required by California foreclosure laws.

208. Because of all of these substantial procedural and substantive defects in the NoD, it is void.

209. Plaintiff seeks this Court's exercise of its equitable powers to confirm the NoD is void, cancel the instrument as without any effect.

**Cancellation of Notices of Trustee's Sale**

210. There are in existence certain written instruments which purport to be Notices of Trustee's Sale as follows:

    a. The notice of trustee's sale, dated May 5, 2017, executed by NDSC, on behalf of and by the direction of BNY, and recorded in the Office of the County Recorder for Santa Clara County. This notice of trustee's sale is void because of the following:

        i. Neither BNY, nor BLS, satisfied the mandatory condition precedent of a notice of intent to acceleration under the DoT;

        ii. NDSC failed to file the mandatory prerequisite NoD prior to filing the NoTS;

        iii. The authorizing DoT was void.

211. The form and contents of the NoTS is as set out in the copy of it which are attached to this complaint as **Exhibit D** and incorporated by reference.

212. Because of all of these substantial procedural and substantive defects in the NoTS, it is void.

213. Plaintiffs seek this Court's exercise of its equitable powers to confirm the NoTS is void, cancel the instrument as without any effect.

Attorneys at Law
San Diego, California

PATEL | STILWELL LLP

**CAUSE OF ACTION SIX**
**NEGLIGENCE**

**Against BLS and BNY**

214.   Plaintiff hereby reincorporates all of the previously numbered paragraphs into this cause of action as if they were each individually pled herein.

215.   Penal Code section 530.5 placed a duty on BLS to abstain from unlawfully utilizing Plaintiff' private personal information.

216.   BLS, breach that duty by utilizing Plaintiff' name, address, and mortgage account number in the unlawful and unauthorized execution and filing of the NoD.  BLS did not have the authority to execute and record the NoD, and therefore the publication is not privileged.

217.   BLS also breached their duty to exercise reasonable care in the review of Plaintiff' loan modification application once BLS had agreed to consider Plaintiff' application by (1) using false, deceptive, or misleading representations or means in connection with the collection of the Note; and (2) using unfair or unconscionable means to collect or attempt to collect a debt by (i) claiming that the mortgage is secured when it is not, (ii) claiming that the Property is subject to foreclosure when it is not, (iii) threatening to foreclose against the Property if payment is not made when they do not have a valid security interest in the Property to execute, (iv) filing of the NoD against the title of the Property when they had no authority to do so, (v) violating the California Homeowner Bill of Right's mandate that Plaintiff get a meaningful opportunity to an available loan modification by utilizing high pressure coercive tactics to induce Plaintiff to either enter into an unconscionable and adhesive contract or give up Plaintiff's attempts to modify the Mortgage.  BLS did this by failing to offer any loan modification; and (vi) BLS additionally was encouraging Plaintiff to allow them to help her refinance the Mortgage, while simultaneously and continuously negatively reporting on her credit to ensure she never would receive a refinance.

218. As a direct and proximate cause of BLS's acts, Plaintiff has sustained general and special damages, including without limitation devaluation of the Property, in an amount to be proven at trial.

## CAUSE OF ACTION SEVEN
## SLANDER OF TITLE

### Against BNY, BLS, and NDSC

219. Plaintiff hereby reincorporates all of the previously numbered paragraphs into this cause of action as if they were each individually pled herein.

220. As described herein above, AWL slandered the Property's title by illegally encumbering a table-funded loan to the Property with the recording of the DoT in direct violation of California Business and Professions Code section 10234. The recording was therefore not subject to any privilege under Civil Code section 47.

221. MERS slandered the Property's title by recording the Assignment 1, when MERS had executed the assignment in its own individual capacity in violation of the DoT and California law, as well as without any authority because of AWL's demise in its merger with Bank of America. The recording was therefore not subject to any privilege under Civil Code section 47.

222. NDSC slandered the Property's title by authorizing and causing to be recorded a notice of trustee sale against the Property without first issuing a notice of intent to accelerate as required by the DoT, without first recording a valid notice of default as required by California foreclosure law, and without a valid power of sale due to the void DoT. The recording was therefore not subject to any privilege under Civil Code section 47.

223. BNY slandered the Property's title by causing to be recorded a notice of default and notice of trustee's sale against the Property without executing a valid substitution of trustee transferring the trusteeship under the DoT from CTC to

NDSC, and without a valid power of sale due to the void DoT. The recording was therefore not subject to any privilege under Civil Code section 47.

224. BLS slandered the Property's title by recording, or causing to be recorded, a notice of trustee's sale without any authority to do so, and without a valid power of sale clause due to the void DoT. The recording was therefore not subject to any privilege under Civil Code section 47.

225. NDSC slandered the Property's title by recording a notice of default and notice of trustee's sale against the Property without executing a substitution of trustee transferring the trusteeship under the DoT from CTC to NDSC, and without a valid power of sale due to the void DoT. The recording was therefore not subject to any privilege under Civil Code section 47.

226. The DoT, the three (3) assignments, the notice of default, and the notice of trustee's sale placed a large encumbrance, three clouds, and two "distress" items on the title to the Property which disparages the title to the Property greatly.

227. Because of the malicious executions and recording of the DoT, the three assignments, the NoD, and the NoTS, Plaintiff's Property has been disparaged greatly and devalued substantially because of the weight of all the illegal recordings against the Property's title. These damages were the direct and proximate result of the recording of the DoT, the three assignments, the NoD, and the NoTS in an amount to be proven at trial.

228. Furthermore, the aforementioned recording was motivated by oppression, fraud, and malice on the part of all Defendants, and each of them, in that they committed all these acts with full knowledge of or reckless disregard for the fact that they neither owned the rights to the Mortgage or were authorized to record the statements. Therefore, the awarding of exemplary and punitive damages is justified.

///

**CAUSE OF ACTION EIGHT**
**QUIET TITLE**
**(Cal. Civil Code § 761.020)**

**Against All Defendants**

229. Plaintiff hereby reincorporates all of the previously numbered paragraphs into this cause of action as if they were each individually pled herein.

230. The legal description for the Property is:

> All that certain real property situated in the city of Campbell, County of Santa Clara, State of California;
> Beginning at a point in the westerly line of first street, distant thereon 387 feet Northerly from the point of intersection thereof with the Northerly line of Campbell Ave.; thence Westerly at right angles and along the Southerly line of the parcel of and conveyed to William V. Dunham by Deed recorded November 11, 1905 in Book 299 of Deeds, pg. 492 and the Westerly prolongation thereof, 149.50 feet; thence Southerly at right angles 50 feet; thence Easterly at right angles 149.50 feet to said line of First St.; Thence Northerly along said line of First St. 50 feet to the point of beginning, and being a portion of the Southwest ¼ section 26 Township 7 South Range 1 West, M.D.B. and M.

231. Plaintiff has a fee simple absolute title to the Property, on the basis of the Grant Deed (the "Deed"), which transfers fee simple absolute title to Plaintiff, and was recorded in the Santa Clara Recorder's Office.

232. Plaintiff alleges that AWL placed an adverse claim to Plaintiff' title to the Property by recording the illegal and void DoT, which purports to encumber Plaintiff' title to the Property and thereby diminishing the Property's value. The DoT is an illegal contract made and recorded by AWL in violation of California Business and Professions Code section 10234, however its presence on the title to the Property remains an adverse claim against Plaintiff' Property.

233. Plaintiff alleges that MERS placed an adverse claim to Plaintiff' title to the Property by recording the illegal and void Assignment-1, which purports to

PATEL | STILWELL LLP
Attorneys at Law
San Diego, California

transfer the illegal encumbrance of the DoT from MERS to BNY and thereby diminishing the Property's value. The Assignment-1 is an illegal contract made and recorded by MERS in violation of California title and agency laws, and the DoT, however its presence on the title to the Property remains an adverse claim against Plaintiff' Property.

234. Plaintiff alleges that NDSC, at the direction and on behalf of BNY, placed an adverse claim to Plaintiff' title to the Property by recording the notice of trustee's sale, which purports to set a date to foreclose on the Property and "distresses" the value of the Property. The NoTS is an illegal contract made and recorded by NDSC, at the direction and on behalf of BNY, in violation of California foreclosure laws and the DoT, however their presence on the title to the Property remains an adverse claim against Plaintiff' Property.

235. Plaintiff alleges that NDSC, at the direction and on behalf of BNY, placed an adverse claim to Plaintiff' title to the Property by recording the NoD. The NoD is an illegal contracts made and recorded by NDSC, at the direction and on behalf of BNY, in violation of California foreclosure laws and the DoT, however their presence on the title to the Property remains an adverse claim against Plaintiff' Property.

236. Plaintiff alleges that BNY, at the direction and on behalf of BNY, placed an adverse claim to Plaintiff' title to the Property by recording the Assignments 1-3 which purport to transfer the void DoT from AWL to BNY, which continues and prolongs the devaluation in Plaintiff's Property by the void DoT's continued existence and enforcement. The Assignments 1-3 are illegal contracts made and recorded by BNY, at the direction and on behalf of BNY, in violation of California title laws and the DoT, however their presence on the title to the Property remains an adverse claim against Plaintiff' Property.

PATEL | STILWELL LLP

Attorneys at Law
San Diego, California

237.   Plaintiff seeks a determination that the title to the Property is free of the encumbrance created by the illegal DoT, the assignments thereof, the NoD, and the NoTS, and an order that they all be stricken from the Property's title record.

### CAUSE OF ACTION NINE
### WRONGFUL FORECLOSURE
**By All Plaintiffs Against All Defendants**

238.   Plaintiff hereby reincorporates all of the previously numbered paragraphs into this cause of action as if they were each individually pled herein.

239.   On June 16, 2016, NDSC initiated non-judicial foreclosure actions against Plaintiff by the filing of the NoD on behalf of BNY, and continued the non-judicial foreclosure against Plaintiff with the recording of the NoTS, all on behalf of BNY.

240.   However, neither BNY, nor NDSC, had authority to initiate non-judicial foreclosure because the DoT had been void since 2005, and there was no valid power of sale to rely upon.   Further, BNY, BLS and NDSC failed to issue a 30-day notice of intent to accelerate and notice of right to an action to assert the non-existence of a default.   For those reasons, BNY, BLS and NDSC were foreclosing without authority to do so.

241.   On June 20, 2016, NDSC, on behalf of BNY, filed the NoD against the Property, however, there was never a valid substitution of trustee executed or recorded replacing NDSC as trustee of the DoT.   Further, there was never any valid assignment executed or recorded transferring the DoT from AWL to BNY.   Also, the DoT had been void since 2005, and therefore, there was no valid power of sale for which to foreclose upon.

242.   In May, 2017, NDSC, on behalf of BNY, filed a notice of trustee's sale against the Property.   There still was never a valid substitution of trustee executed or recorded replacing NDSC as trustee of the DoT.   Further, there was never any assignment executed or recorded transferring the DoT from AWL to

BNY. Also, the DoT had been void since 2005, and therefore, there was no valid power of sale for which to foreclose upon. For those reasons, BNY and NDSC were foreclosing without authority to do so.

243. However, in spite of the void DoT, the illegal assignments, the void NoD, and the illegal NoTS, and lack of any authority whatsoever, NDSC, at the behest and direction of the BNY and BLS, continue to post and record notices of trustee's sale, threaten trustee's sale, and are intending on conducting an illegal and unauthorized non-judicial foreclosure of the Plaintiffs' Property on June 1, 2017.

244. As a direct and proximate cause of this false claim to title and unauthorized foreclosure, Plaintiff has been prejudiced by the unlawful and unauthorized initiation and persecution towards and illegal sale of her Property. Plaintiff has thereby sustained general and special damages in an amount to be proven at trial.

Further, all of these defendants, and each of them, have taken these actions with full knowledge of their unauthorized capacity, did these actions knowingly, willfully, and with intent to oppress Plaintiff with malice, and therefore, Plaintiff requests this Court to award Plaintiff exemplary and punitive damages as this Court deems appropriate.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1. For an order permanently enjoining BLS, BNY, and NDSC from continuing its unfair business practices in violation of Business and Professions Code section 17200 as proven at trial;

2. For an order canceling the Assignment-1;

3. For an order canceling the Assignment-2;

4. For an order canceling the Assignment-3;

5. For an order canceling the DoT;

6. For an order canceling the NoD;

**PATEL | STILWELL** LLP

Attorneys at Law
San Diego, California

7.  For an order canceling the NoTS;

8.  For an order determining the title of Plaintiff' Property against the adverse claim of the DoT, purporting to encumber the Property, the three assignments, the NoD, and the NoTS, which cloud the Property's title;

9.  For an order determining that the Property's title is cleared of all interests other than Plaintiff's;

10. For general damages in the sum proven at trial;

11. For special damages in the sum proven at trial;

12. For statutory damages in the sum proven at trial;

13. For punitive and exemplary damages in the sum proven at trial as determined proper by the Court;

14. For prejudgment interest at a rate of 10% per annum;

15. For post judgment interest at a rate of 10% per annum;

16. For attorney's fees and costs of suit;

17. For any other further relief the court may deem proper.

Dated:  May 30, 2017          **PATEL | STILWELL, LLP**


                              */s/ Andrew R. Stilwell*
                              _____
                              ANDREW R. STILWELL, ESQ.
                              3160 Camino Del Rio South, Suite 313
                              San Diego, CA 92108
                              Telephone: (619) 940-6623
                              Email: AStilwell@PatelStilwell.com

                              Attorney for Plaintiff

# EXHIBIT A

DoT

# EXHIBIT A

DoT

287-20-007

**RECORDING REQUESTED BY**
**Alliance Title Company**
**AND WHEN RECORDED MAIL TO**

**Countrywide Home Loans, Inc.**
**MS SV-79 Document Processing**
**P.O. Box 10423**
**Van Nuys, CA 91410-0423**

Order No. 11358219~001

DOCUMENT: 18682576



| | Pages: 29 |
|---|---|
| Fees.... | 93.00 |
| Taxes... | |
| Copies.. | |
| AMT PAID | 93.00 |

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Alliance Title Company

RDE # 007
11/18/2005
8:00 AM

SPACE ABOVE THIS LINE FOR RECORDER'S US

.610 121280728 D2 001 001

# Deed of Trust

SEPARATE PAGE PURSUANT TO GOVT CODE 27361.6

Recover (rev. 09/05/01)

Recording Requested By:
M. SINGER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
MELISSA BAUTISTA

———————————————— [Space Above This Line For Recording Data] ————————————————

11358219                          00012128072811005

[Escrow/Closing #]                    [Doc ID #]

# DEED OF TRUST

MIN 1000157-0006091535-8

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  NOVEMBER 09, 2005   , together with all Riders to this document.
(B) "Borrower" is
CYNTHIA HOLIDAY, AN UNMARRIED WOMAN

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16                                      Initials: _C H_

-6A(CA) (0207)    CHL (09/02)(d)    VMP MORTGAGE FORMS - (800)521-7291          Form 3005  1/01
CONV/VA

*23991*                                    *12128072800000100 6A*

Borrower's address is
73-75 N FIRST STREET, CAMPBELL, CA 95008
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
P.O. Box 10219, Van Nuys, CA 91410-0219
(D) "Trustee" is
CTC FORECLOSURE SERVICES CORPORATION
155 N. LAKE AVENUE, PASADENA, CA 91109-7137 ,
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated NOVEMBER 09, 2005 . The
Note states that Borrower owes Lender
SIX HUNDRED FIFTY THOUSAND and 00/100

Dollars (U.S. $ 650,000.00 ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than DECEMBER 01, 2035 .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | [X] 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | [X] Other(s) [specify] |
| | | 0 |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage
to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY of SANTA CLARA :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 27941034 which currently has the address of
73-75 N FIRST STREET, CAMPBELL ,
[Street/City]
California 95008 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Initials: _C H_

Form 3005 1/01

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

Initials: C H

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____

_____ (Seal)

CYNTHIA HOLIDAY                                    -Borrower

_____ (Seal)

                                                  -Borrower

_____ (Seal)

                                                  -Borrower

_____ (Seal)

                                                  -Borrower

JEAN HOLLINGSWORTH
Commission # 1410541
Notary Public - California
Santa Clara County
My Comm. Expires Apr 12, 2007

DOC ID #: 00012128072811005

State of California
County of Santa Clara }ss.

On NOV. 10, 2005 before me, JEAN Hollingsworth, Notary Public
personally appeared

Cynthia Holiday

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

JEAN HOLLINGSWORTH
Commission # 1410641
Notary Public - California
Santa Clara County
My Comm. Expires Apr 12, 2007

-6A(CA) (0207)          CHL (09/02)          Page 16 of 16          Initials: C H

Form 3005 1/01

## Exhibit A
## Legal Description

All that certain real property situate in the City of Campbell, County of Santa Clara, State of California, described as follows:

Beginning at a point in the Westerly line of First Street, distant thereon 387 feet Northerly from the point of intersection thereof with the Northerly line of Campbell Avenue; thence Westerly at right angles and along the Southerly line of the Parcel of and conveyed to William V. Dunham by Deed recorded November 11, 1905 in Book 299 of Deeds, page 492 and the Westerly prolongation thereof, 149.50 feet; thence Southerly at right angles 50 feet; thence Easterly at right angles 149.50 feet to said line of First Street; thence Northerly along said line of First Street 50 feet to the point of beginning, and being a portion of the Southwest 1/4 of Section 26 Township 7 South Range 1 West, M.D.B. and M.

# ADJUSTABLE RATE RIDER

**(PayOption MTA Twelve Month Average Index - Payment Caps)**

11358219                    00012128072811005

[Escrow/Closing #]          [Doc ID #]

THIS ADJUSTABLE RATE RIDER is made this **NINTH** day of **NOVEMBER, 2005**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **AMERICA'S WHOLESALE LENDER**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

73-75 N FIRST STREET
CAMPBELL, CA 95008
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for changes in the interest rate and the monthly payments, as follows:

- **PayOption MTA ARM Rider**
**1E310-XX (12/04)(d)**                    Page 1 of 6





## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      1.500 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first            day of JANUARY, 2006        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Beginning with the first Interst Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding          THREE & 10/100 percentage point(s) (     3.100 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than      9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the FIRST            day of each month beginning on January, 2006          . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 01, 2035      , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

**• PayOption MTA ARM Rider**
**1E310-XX (12/04)**                    Page 2 of 6

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 2,243.28 , unless adjusted under Section 3 (F).

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of JANUARY, 2007 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN percent ( 115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options;

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by

this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

CYNTHIA HOLIDAY                                                -Borrower

_____              -Borrower

_____              -Borrower

_____              -Borrower

• PayOption MTA ARM Rider
1E310-XX (12/04)                    Page 6 of 6

# 1-4 FAMILY RIDER
### (Assignment of Rents)

**After Recording Return To:**
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423


**Prepared By:**
MELISSA BAUTISTA




11358219                  00012128072811005
[Escrow/Closing #]          [Doc ID #]



**MULTISTATE 1 - 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

Page 1 of 5

VMP®-57R (0411)     CHL (11/04)(d)                    Initials: C H
                    VMP Mortgage Solutions, Inc. (800)521-7291          Form 3170 1/01





DOC ID #: 00012128072811005

THIS 1-4 FAMILY RIDER is made this NINTH day of NOVEMBER, 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

73-75 N FIRST STREET, CAMPBELL, CA 95008

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

Initials: C H

⟨VMP⟩-57R (0411)          CHL (11/04)          Page 2 of 5          Form 3170 1/01

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Initials: C.H

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

Initials: C H

-57R (0411)    CHL (11/04)         Page 4 of 5              Form 3170 1/01

DOC ID #: 00012128072811005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ *Cynthia Holiday* _____(Seal)
CYNTHIA HOLIDAY                                                  - Borrower

_____(Seal)
                                                                - Borrower

_____(Seal)
                                                                - Borrower

_____(Seal)
                                                                - Borrower

# EXHIBIT B

ASSIGNMENTS

# EXHIBIT B

ASSIGNMENTS



RECORDING REQUESTED BY:
RECONTRUST COMPANY
**AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:**
RECONTRUST COMPANY
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA 93063

**ATTN: Nallely Ochoa**
**TS No. 08-0002165**

DOCUMENT: 20766090    Pages: 1

Fees. . . 36 00
Taxes. . .
Copies. .
AMT PAID 36 00

REGINA ALCOMENDRAS          RDE # 012
SANTA CLARA COUNTY RECORDER   7/07/2010
Recorded at the request of   11:54 AM
Recording Service

G802354

## SUBSTITUTION OF TRUSTEE AND ASSIGNMENT OF DEED OF TRUST

The undersigned MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (hereinafter referred to as Beneficiary) is the Beneficiary of that certain Deed of Trust dated 11/09/2005, executed by CYNTHIA HOLIDAY, AN UNMARRIED WOMAN, Trustor, to CTC FORECLOSURE SERVICES CORPORATION, as Trustee, and recorded as Instrument No. 18682576 on 11/18/2005, of Official Records in the County Recorder's Office of SANTA CLARA County, California. NOW THEREFORE, Beneficiary hereby substitutes RECONTRUST COMPANY, N.A., successor in interest by merger to RECONTRUST COMPANY, A NEVADA CORPORATION, WHOSE ADDRESS IS:1757 TAPO CANYON ROAD, SVW-88, SIMI VALLEY, CA 93063 , as Trustee under said Deed of Trust herein referred to, in the place and stead of and with all rights, title, powers, and interest of the former trustee described above.

FOR VALUE RECEIVED, the undersigned hereby grants, assigns, conveys and transfers to BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDER S CWALT, INC. ALTERNATIVE LOAN TRUST 2005-76 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-76 all beneficial interest under that certain Deed of Trust described above. Said described land: "As more fully described in the above referenced Deed of Trust." Together with the note or notes therein described or referred to, the money due and to become due thereon with the interest, and all rights accrued or to accrue under said Deed of Trust.

DATED: June 29, 2010

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

State of: **CALIFORNIA**            )BY:
County of: **VENTURA**              )
                                     Kevin Rudolph, Assistant Secretary
On **JUL 0 1 2010** before me, **MICHELLE I. MILLER**                    , notary public, personally appeared
      **KEVIN RUDOLPH**                                , who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph
is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
Notary Public's Signature

**MICHELLE I. MILLER**

MICHELLE I. MILLER
COMM. #1836833
Notary Public - California
Los Angeles County
My Comm. Expires Feb. 15, 2013

*Form subasgnmnt (01/09)*

21248533 1

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA  93063

DOCUMENT: 21248533          Pages: 1

Fees.... 18 00
Taxes...
Copies.
AMT PAID    18.00

REGINA ALCOMENDRAS          RDE # 010
SANTA CLARA COUNTY RECORDER
Recorded at the request of   7/19/2011
Recording Service            1:35 PM

TS No. 08-0002165

G802354

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/~~MORTGAGE~~

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

**THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2005-76, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-76**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 11/09/2005, EXECUTED BY: CYNTHIA HOLIDAY, AN UNMARRIED WOMAN, TRUSTOR: TO CTC FORECLOSURE SERVICES CORPORATION, TRUSTEE AND RECORDED AS INSTRUMENT NO. 18682576 ON 11/18/2005, OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE OF SANTA CLARA COUNTY, IN THE STATE OF CALIFORNIA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

DATED: ~~January 17, 2008~~           MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

**JUL 1 4 2011**

State of:  **CALIFORNIA**          )     BY:                                    **JUL 15 2011**
County of:  **VENTURA**           )          Kevin Rudolph, Assistant Secretary

On  JUL 1 5 2011  before me,          **K. Mercado**          , notary public, personally appeared
**KEVIN RUDOLPH**                    , who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature                    Km                    (Seal)

K. Mercado

K. MERCADO
Commission # 1818170
Notary Public - California
Ventura County
My Comm. Expires Oct 18, 2012

*Form asgnmnt (01/09)*

DOCUMENT: 21537835

Pages: 2

Fees. . . . 21.00
Taxes. . . .00
Copies . . .00
AMT PAID 21.00

0021537835

Recording Requested By:
**Bank of America**
Prepared By: Cecilia Rodriguez
**450 E. Boundary St.**
**Chapin, SC 29036**
**888-603-9011**
When recorded mail to:
**CoreLogic**
**450 E. Boundary St.**
**Attn: Release Dept.**
**Chapin, SC 29036**

DocID# 18912128072819815
Property Address:
**73-75 N 1st St**
**Campbell, CA 95008-2032**
CA0-ADT 17129293        2/9/2012

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Accounting Customer

RDE # 888
2/15/2012
08:19 AM

This space for Recorder's use

MIN #: 1000157-0006091535-8        MERS Phone #: 888-679-6377

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is **1901 E Voorhees Street, Suite C, Danville, IL 61834** does hereby grant, sell, assign, transfer and convey unto **THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST  2005-76, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-76** whose address is **101 BARCLAY ST - 4W, NEW YORK, NY  10286** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Original Lender:  **AMERICA'S WHOLESALE LENDER**
Original Borrower(s):  **CYNTHIA HOLIDAY, AN UNMARRIED WOMAN**
Original Trustee:  **CTC FORECLOSURE SERVICES CORPORATION**
Date of Deed of Trust:  **11/9/2005**
Original Loan Amount:  **$650,000.00**

Recorded in Santa Clara County, CA on: **11/18/2005, book N/A, page N/A and instrument number 18682576**

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
**FEB 10 2012**

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By:

Bud Kamyabi Assistant Secretary

State of California
County of Ventura

On __FEB 10 2012__ before me, __Desiree Carson__, Notary Public, personally appeared
__Bud Kamyabi__
, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: __Desiree Carson__ (Seal)
My Commission Expires: __December 19, 2013__

DESIREE CARSON
Commission # 1873687
Notary Public - California
Ventura County
My Comm. Expires Dec 19, 2013

Exhibit C

NoD

Exhibit C

NoD

DOCUMENT: 23340600

| | | Pages: | 4 |
|---|---|---|---|
| | Fees.... | 34.00 |
| | Taxes... | .00 |
| | Copies.. | .00 |
| | AMT PAID | 34.00 |

23340600

REGINA ALCOMENDRAS                                    RDE # 00
SANTA CLARA COUNTY RECORDER                           6/20/201'
Recorded at the request of                           12:54 PI
ServiceLink - Irvine SIM

.RECORDING REQUESTED BY:
National Default Servicing Corporation,
an Arizona Corporation
WHEN RECORDED MAIL TO:
National Default Servicing Corporation,
an Arizona Corporation
7720 N. 16ᵗʰ Street, Suite 300
Phoenix, AZ 85020

NDSC File No. : 15-21134-SP-CA
Title Order No. : 150218017-CA-VOI
Property Address: 73-75 N First Street Campbell CA 95008
APN: 279-41-034

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST
### IMPORTANT NOTICE

*ATTENTION RECORDER*: THE FOLLOWING REFERENCE TO AN ATTACHED SUMMARY IS
APPLICABLE TO THE NOTICE PROVIDED TO THE TRUSTOR ONLY PURSUANT TO CIVIL CODE
2923.3
NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR
PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have
the legal right to bring your account in good standing by paying all of your past due payments plus
permitted costs and expenses within the time permitted by law for reinstatement of your account,
which is normally five business days prior to the date set for the sale of your property. No sale date
may be set until approximately 90 days from the date this notice of default may be recorded (which
date of recordation appears on this notice).

This amount is $320,868.13, as of 06/17/2016 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as
insurance and taxes) required by your Note and Deed of Trust or Mortgage. If you fail to make
future payments on the loan, pay taxes on the property, provide insurance on the property, or pay
other obligations as required by the Note and Deed of Trust or Mortgage, the beneficiary or
mortgagee may insist that you do so in order to reinstate your account in good standing. In
addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide
reliable written evidence that you paid all senior liens, property taxes, and hazard insurance
premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization
of the entire amount you must pay. You may not have to pay the entire unpaid portion of your
account, even though full payment was demanded, but you must pay all amounts in default at the

Page 1 of 3

time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months

after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by the transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

Select Portfolio Servicing, Inc.
c/o National Default Servicing Corporation, an Arizona Corporation
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020     Phone 602-264-6101   Sales Website: www.ndscorp.com/sales/

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.  Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

This is an attempt to collect a debt and any information obtained will be used for that purpose.

NOTICE IS HEREBY GIVEN THAT : NATIONAL DEFAULT SERVICING CORPORATION, an Arizona Corporation, is either the original Trustee, the duly appointed substituted Trustee or acting as agent for the Trustee or Beneficiary under a Deed of Trust dated 11/09/2005, executed by Cynthia Holiday, an unmarried woman, as Trustor, to secure certain obligations in favor of Mortgage Electronic Registration Systems, Inc., as nominee for America's Wholesale Lender, its successors and assigns as beneficiary recorded 11/18/2005 as Instrument No. 18682576 (or Book, Page) of the Official Records of Santa Clara County, CA.  Said obligations including ONE NOTE FOR THE ORIGINAL sum of $650,000.00.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of : FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL, INTEREST AND IMPOUNDS WHICH BECAME DUE ON 05/01/2009 AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL, INTEREST AND IMPOUNDS, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEY'S FEES.

That by reason thereof, the present beneficiary under such Deed of Trust has executed and delivered to duly appointed Trustee a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The Declaration required by California Civil Code Sections 2923.5 or 2923.55 is attached hereto.

Dated  :  _6/16_, 2016

National Default Servicing Corporation, an Arizona Corporation,  as Trustee for Bank of New York Mellon, f/k/a The Bank of New York, as trustee, on behalf of the holders of the Alternative Loan Trust 2005-76, Mortgage Pass-Through Certificates Series 2005-76

By:  Brenda Morrison, Trustee Sales Representative

3 of 3

# CALIFORNIA DECLARATION OF COMPLIANCE
## (CAL.CIV.CODE § 2923.55(c))

Borrower Name: CYNTHIA HOLIDAY

Address: 73-75 N FIRST STREET, CAMPBELL, CA 95008

Beneficiary: Bank of New York Mellon, f/k/a The Bank of New York, as trustee, on behalf of the holders of the Alternative Loan Trust 2005-76, Mortgage Pass-Through Certificates Series 2005-76

The undersigned beneficiary or authorized agent for the beneficiary hereby represents and declares under the penalty of perjury that:

1) [X] On 05/26/2015 contact was made with the borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure as required by California Civil Code § 2923.55(b)(2).

2) [ ] On _____ the due diligence efforts were satisfied. No contact was made with the borrower despite the due diligence of beneficiary or their authorized agent pursuant to California Civil Code § 2923.55(f).

3) [ ] The borrower has surrendered the secured property as evidenced by a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, their authorized agent or the trustee pursuant to California Civil Code §2920.5(c).

4) [ ] The beneficiary or their authorized agent has confirmed that the borrower(s) filed for bankruptcy and the proceedings have not been finalized to wit, there is no order on the court's docket closing or dismissing the bankruptcy case pursuant to California Civil Code §2920.5(c).

5) [ ] The provisions of California Civil Code §2923.55 do not apply because the property is not owner occupied as defined by California Civil Code §2924.15.

The undersigned instructs the trustee to proceed with non-judicial foreclosure proceedings and expressly authorizes the trustee or their authorized agent to sign the notice of default containing the declaration re: contact required pursuant to California Civil Code §2923.5.

Dated: AUG 1 4 2015

By: _____

Select Portfolio Servicing, Inc. as authorized agent of Beneficiary

Ray Salazar
Document Control Officer

# Exhibit D

### NoTS

# Exhibit D

### NoTS

RECORDING REQUESTED BY:
National Default Servicing Corporation
WHEN RECORDED MAIL TO:
NATIONAL DEFAULT SERVICING CORPORATION
7720 N. 16th Street, Suite 300
Phoenix, AZ 85020

T.S. No. 15-21134-SP-CA
Title No. 150218017-CA-VOI
A.P.N. 279-41-034

# NOTICE OF TRUSTEE'S SALE

_ATTENTION RECORDER_: THE FOLLOWING REFERENCE TO AN ATTACHED SUMMARY IS APPLICABLE TO THE NOTICE PROVIDED TO THE TRUSTOR ONLY PURSUANT TO CIVIL CODE 2923.3
NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 11/09/2005. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

A public auction sale to the highest bidder for cash, (cashier's check(s) must be made payable to National Default Servicing Corporation), drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state; will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made in an "as is" condition, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor: **Cynthia Holiday, an unmarried woman**
Duly Appointed Trustee: **National Default Servicing Corporation**
Recorded 11/18/2005 as Instrument No. 18682576 (or Book, Page) of the Official Records of Santa Clara County, California.

Date of Sale: **06/01/2017 at 10:00 AM**
Place of Sale: **At the Gated North Market Street entrance of the Superior Courthouse, 191 N First Street, San Jose, CA 95113**
Estimated amount of unpaid balance and other charges: **$990,887.87**
Street Address or other common designation of real property: **73-75 N First Street, aka 75 N 1st St., Campbell, CA 95008**
A.P.N.: **279-41-034**



The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

The requirements of California Civil Code Section 2923.5(b)/2923.55(c) were fulfilled when the Notice of Default was recorded.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call 714-730-2727 or visit this Internet Web site www.ndscorp.com/sales, using the file number assigned to this case 15-21134-SP-CA. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

Date: 05/05/2017

National Default Servicing Corporation
c/o Tiffany & Bosco, P.A., its agent,
1230 Columbia Street, Suite 680
San Diego, CA 92101      Toll Free Phone:  888-264-4010
Sales Line 714-730-2727; Sales Website: www.ndscorp.com/sales

Zahara Joyner, Trustee Sales Representative

# California Civil Code section 2924.8 Notice of Foreclo... Sale

Dear resident of property subject to foreclosure sale:

Foreclosure process has begun on this property, which may affect your right to continue to live in this property. Twenty days or more after the date of this notice, this property may be sold at foreclosure. If you are renting this property, the new property owner may either give you a new lease or rental agreement or provide you with a 90-day eviction notice. You may have a right to stay in your home for longer than 90 days. If you have a fixed-term lease, the new owner must honor the lease unless the new owner will occupy the property as a primary residence or in other limited circumstances. Also, in some cases and in some cities with a "just cause for eviction" law, you may not have to move at all. All rights and obligations under your lease or tenancy, including your obligation to pay rent, will continue after the foreclosure sale. You may wish to contact a lawyer or your local legal aid office or housing counseling agency to discuss any rights you may have.

## Spanish Translation

Estimado residente de la propiedad sujeta a la venta por ejecución hipotecaria:

Ha comenzado el proceso de ejecución hipotecaria sobre esta propiedad, lo que podría afectar su derecho a seguir viviendo en ella. Dentro de un plazo de veinte días o más posteriores a la fecha de este aviso, es posible que esta propiedad se venda por ejecución hipotecaria. Si usted alquila esta propiedad, el nuevo propietario de la misma podría ofrecerle un nuevo acuerdo de alquiler o arrendamiento o enviarle un aviso de desalojo con 90 días de anticipación. Usted tendría derecho a permanecer en su hogar durante un periodo superior a 90 días. Si tiene un arrendamiento a plazo fijo, el nuevo propietario debe cumplir el arrendamiento a menos que esta persona ocupe la propiedad en carácter de residencia principal o en otras circunstancias limitadas. Asimismo, en algunos casos y en algunas ciudades que tengan una ley de "motivo justo para el desalojo", es posible que no tenga que mudarse en absoluto. Continuarán todos los derechos y obligaciones en virtud del arrendamiento o tenencia, inclusive su obligación de pagar el alquiler..

## Chinese Translation

親愛的面臨法拍物業的住戶：

此物業的法拍程序已經開始，這可能會影響到您繼續在此物業居住的權利。 自本通知發出的第二十天起，此物業可以法拍方式出售。如果您正在租住此物業，新的業主會給您一份新的租約，或向您發出90天的搬遷通知。您有權在您的房屋內居住90天以上。如果您持有固定期限的租約，新的業主必須遵守該租約，除非新業主欲將該房屋作為zhuyao住處，或處於其他限制條件。而且，在某些個案和實施"正當理由驅逐"法規的其他城市，您可能根本就無需遷出。您租約或租期內的所有權利和義務，包括您支付租金的義務，在法 拍後也仍將繼續。您可聯絡律師、您當地的法律援助辦公室或房務咨詢機構，以討論您可擁有的權利。

## Tagalog Translation

Minamahal na residente ng ari-ariang sakop ng pagbebenta dahil sa pagka-remata:

Ang proseso ng pagreremata ay nagsimula na para sa ari-ariang ito, na maaaring makaapekto sa inyong karapatan na patuloy na manirahan sa ari-arian. Dalawampung araw o higit pa makalipas ang petsa ng abisong ito, ang ari-arian na ito ay maaaring maibenta sa pagkaremata. Kung kayo ay nangungupahan sa ariarian na ito, ang bagong magmamay-ari ng ari-arian ay maaaring bigyan kayo ng bagong kasunduan sa pag-arkila o pangungupahan o maaaring magbigay sa inyo ng 90-araw na abiso ng pagpapalayas. Maaaring may karapatan kayong manatili sa inyong tahanan nang mahigit sa 90 araw. Kung kayo ay may kasunduan sa pagaarkila na may takdang panahon, ang bagong may-ari ay dapat kilalanin ang kasunduan maliban kung gagamitin ng bagong may-ari ang ari-arian bilang pangunahing tirahan, o sa ibang mga limitadong kalagayan. Dagdag pa, sa ilang mga kaso at sa ilang mga siyudad na may batas sa "makatarungang dahilan para saapagpapalayas", maaaring hindi mo kinakailangang umalis. Lahat ng mga karapatan at panunagutan sa ilalim ng iyong kasunduan sa pag-arkila o pangungupahan, kabilang na ang iyong pananagutan na magbayad ng upa, ay magpapatuloy matapos ang pagbebenta dahil sa pagkaremata. Maaari mong naisin na makipagugnayan sa iyong abogado o sa iyong lokal na opisina ng tulong na pang-legal o ahensiya ng tagapagpayo sa pabahay upang talakayin ang anumang mga karapatan na maaaring mayroon ka.

## Vietnamese Translation

Gửi người sống tại cơ ngơi bị phát mại:

Quá trình phát mại cơ ngơi này đã bắt đầu và có thể ảnh hưởng đến quyền tiếp tục sống tại cơ ngơi này của quý vị. Sau hai mươi ngày trở lên của thông báo này, cơ ngơi này có thể bị phát mại. Nếu quý vị đang thuê cơ ngơi này, chủ sở hữu mới của cơ ngơi này có thể cung cấp cho quý vị một thỏa thuận thuê mới hoặc một thông báo trục xuất nhà trong 90 ngày. Quý vị có thể có quyền ở lại lâu hơn 90 ngày. Nếu quý vị có một hợp đồng thuê nhà định hạn, chủ sở hữu mới phải tôn trọng hợp đồng thuê nhà này trừ khi chủ sở hữu mới sẽ sử dụng cơ ngơi này như là nơi cư trú chính hoặc trong các trường hợp hạn chế khác. Ngoài ra, trong một số trường hợp và tại một số thành phố có luật "lý do ra khỏi nhà chính đáng", quý vị có thể không phải chuyển nhà. Tất cả các quyền và nghĩa vụ theo hợp đồng thuê nhà của quý vị, bao gồm nghĩa vụ trả tiền thuê nhà của quý vị, sẽ tiếp tục có hiệu lực sau khi phát mại. Quý vị có thể liên hệ với một luật sư hoặc văn phòng trợ giúp pháp lý địa phương của quý vị hoặc cơ quan tư vấn về nhà ở để thảo luận về các quyền quý vị có thể có.

## Korean Translation

경매처분에 직면한 주택 소유주 여러분께,

이 주택에 계속 거주하실 수 있는 귀하의 권리에 영향을 줄 수 있는 경매 절차가 시작되었습니다. 이 통지서 날짜로부터 20일 정도가 지난 후, 이 주택은 경매로 매각될 수 있습니다. 이 주택을 임차하고 계시다면, 새로운 주택 소유주가 귀하에게 새 리스 또는 임차 계약서를 제공하거나, 아니면 90일 이내 퇴거 통지서를 드릴 것입니다. 귀하에게는 90일 이상 자택에 주거하실 권리가 있습니다. 만약 고정기간 리스 계약을 체결하셨다면, 새로운 소유주가 해당 주택을 주된 주거지로 점유하거나 제한된 상황이 아닌 한, 새로운 소유주는 해당 리스 계약을 존중해야 합니다. 또한, "정당한 사유에 의한 퇴거(just cause for eviction)"법에 따른 일부 경우와 일부 도시에 있는 경우, 전혀 이사하지 않아도 될 가능성도 있습니다. 임차료를 지불해야 하는 의무를 포함하여 귀하의 리스 또는 임차계약 하의 모든 권리와 의무는 경매 판매 이후에도 계속됩니다. 귀하의 변호사 또는 지역 법률 지원 사무소 또는 주택 상담 기관에 연락하여 귀하의 권리에 대해상담하실 수도 있습니다.

## NOTICE OF SALE
## SUMMARY OF KEY INFORMATION

The attached notice of sale was sent to Cynthia Holiday, an unmarried woman in relation to 73-75 N First Street aka 75 N 1st St., Campbell, CA 95008

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 11/09/2005 UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.

IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

The total amount due in the notice of sale is **$990,887.87**

Your property is scheduled to be sold on 06/01/2017 at 10:00 AM At the Gated North Market Street entrance of the Superior Courthouse, 191 N First Street, San Jose, CA 95113 .

However, the sale date shown on the attached notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call **(602) 412-5132**, or visit this Internet Web site address **WWW.NDSCORP.COM/SALES** using the file number assigned to this case 15-21134-SP-CA Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

If you would like additional copies of this summary, you may obtain them by calling **(602) 412-5131.**

出售通知
关键信息摘要

本文中包含的有关 Cynthia Holiday, an unmarried woman
（所涉抵押贷款或产权契约违约的房产描述）

的出售通知发送给73-75 N First Street aka 75 N 1st St., Campbell, CA 95008。
（委托人姓名）

你的 DEED OF TRUST 于11/09/2005 已经逾期违约。
（产权契约或抵押贷款）　　　　　（日期）
除非你采取行动保护你的房产，否则该房产将被公开出售。

如果你需要了解对你的诉讼程序的性质，应该联系一名律师。

法拍书面通知的总金额是 $990,887.87.

你的房产预计出售的时间 at 06/01/2017 10:00 AM
（出售日期和时间）

出售地点　　　　　At the Gated North Market Street entrance of the Superior
Courthouse, 191 N First Street, San Jose, CA 95113。
（出售位置）

然而，根据加州民法第2924章g条款，本文中包含的法拍书面通知上显示的出售日期可能会被
抵押权人，受益人，受托人，或法院一次或多次推迟。该法规定，作为对不在法拍现场人士的
一种宽限，有关受托人推迟出售的信息要提供给你和公众。如果你想了解你的房产出售日期是
否已被推迟，以及（如适用）重新安排的法拍时间和日期，可致电
 **(602) 412-5132**
（关于受托人出售信息的电话号码）
或访问互联网网址，**WWW.NDSCORP.COM/SALES** 用指定的档案编号
（互联网网址提供的出售该房产的信息）
 **15-21134-SP-CA** 查找。
（案件档案号）

关于推迟法拍的信息，持续时间会很短，或仅在预定法拍时间前不久发布，可能不会立即反映
在电话信息或互联网的网址上。最好验证推迟信息的方法是，出席预定的拍卖。

如果你想获得更多的本摘要副本，请拨打下列电话 **(602) 412-5131.**
（电话号码）

**Notice of Sale – Chinese (Revised 12/18/12)**

<div align="center">

매각 공고
주요 정보 요약

</div>

첨부된 매각 공고는 Cynthia Holiday, an unmarried woman 에게 발송되는 것이며, 이는
<div align="center">(신탁 설정자 성명)</div>

73-75 N First Street aka 75 N 1st St., Campbell, CA 95008
에 관한 것입니다.
(채무 불이행 저당권 또는 신탁 증서를 보증하는 부동산에 대한 설명)

<div align="center">귀하는 DEED OF TRUST 현재 날짜로 11/09/2005 하에서</div>
<div align="center">(신탁 증서 또는 저당권)</div>

채무 불이행 상태입니다. 귀하의 부동산을 보호하기 위해 조치를 취하시지 않는 한, 귀하의 부동산은 공매로 매각 처분될 수 있습니다. 귀하에게 취해지는 이러한 법적 절차에 대한 설명이 필요하신 경우 변호사와 상담하십시오.

<div align="center">매각 공고에서 지불되어야 할 총액은 **$990,887.87**</div>
니다.

귀하의 부동산은 06/01/2017 10:00 AM 에 At the Gated North Market Street entrance of the Superior Courthouse, 191 N First Street, San Jose, CA 95113)
<div align="center">(매각 일자 및 시간)      (매각 장소)</div>
에서 매각되기로 일정이 잡혀 있습니다.

그러나 캘리포니아주 민법 2924g항에 준하여, 첨부된 매각 공고에 나타난 매각 일자는 저당권자, 신탁수익자, 수탁자, 또는 법정에 의해 한 번 이상 연기될 수 있습니다. 법에 따라, 수탁자 매각 연기에 관한 정보는 매각에 참석하지 않는 사람들에 대한 호의로서 귀하 및 일반 대중에게 제공되어야 합니다. 매각 일자가 연기되었는 지, 그리고 해당되는 경우 이 부동산의 연기된 매각 일자 및 시간에 대해 알기 원하시는 경우, **(602) 412-5132** 로 전화하시거나 또는 웹사이트 주소
(수탁자 매각에 관한 정보 안내 전화번호)
**WWW.NDSCORP.COM/SALES** 를 방문해 본 사례 배정 파일 번호
(본 부동산의 매각에 관한 정보 안내 인터넷 웹사이트)
15-21134-SP-CA 를 사용하시면 됩니다.
(사례 파일 번호)

매우 짧은 기간의 연기 또는 매각 일정과 가까운 시간에 발생하는 연기는 정보 안내 전화나 인터넷 웹사이트에 즉각적으로 나타나지 않을 수 있습니다. 연기 정보를 확인하는 최선의 방법은 매각 예정일에 참석하는 것입니다. 본 요약서의 추가적인 사본을 원하시는 경우, **(602) 412-5131.** (으)로 전화하시면
<div align="center">(전화번호)</div>
보내드립니다.

**Notice of Sale – Korean (Revised 12/18/12)**

NOTICE OF SALE (PABATID NG PAGBEBENTA)
BUOD NG PANGUNAHING IMPORMASYON

Ang nakakalip na notice of sale (pabatid ng pagbebenta) ay ipinadala kay

Cynthia Holiday, an unmarried woman bilang kaugnayan
            (Trustor)

sa 73-75 N First Street aka 75 N 1st St., Campbell, CA 95008
        (paglalarawan sa ari-arian na nagtitibay sa mortgage o deed of trust na hindi nabayaran.)

IKAW AY HINDI NAKABAYAD SA ILALIM NG DEED OF TRUST NA MAY PETSA NA 11/09/2005 MALIBAN KUNG IKAW AY KUMILOS UPANG MAPROTEKTAHAN ANG INYONG ARI-ARIAN, MAAARI ITONG IBENTA SA ISANG PAMPUBLIKONG PAGBEBENTA.

KUNG KINAKAILANGAN NINYO NG PAGPAPALIWANAG SA KALIKASAN NG PAGLILITIS LABAN SA INYO, KAILANGAN NINYONG MAKIPAG-UGNAYAN SA ISANG ABOGADO.

Ang kabuuang halaga na dapat bayaran sa notice of sale (pabatid ng pagbebenta) ay **$990,887.87**

Ang inyong ari-arian ay nakatakdang mabenta sa at 06/01/2017 10:00 AM
                                                                (petsa at oras ng pagbebenta)
sa At the Gated North Market Street entrance of the Superior Courthouse, 191 N First Street, San Jose, CA 95113
        (lugar ng bentahan)
        Gayunman, ang petsa ng pagbebenta na ipinapakita sa nakalakip na notice of sale (pabatid ng pagbebenta) ay maaaring ma-postpone ng isa o mas marami pang beses ng nagbigay ng mortgagee (nagkaloob ng mortgage), beneficiary (benepisyaryo), trustee, o ng korte, alinsunod sa Seksyon 2924g ng California Civil Code. Hinihiling ng batas na ang impormasyon tungkol sa mga pag-postpone sa pagbebenta ng trustee ay handang maibigay sa inyo at sa publiko, bilang isang kagandahang-loob doon sa mga hindi makakadalo sa bentahan. Kung nais ninyong lubos pang matutunan kung na-postpone ang inyong petsa sa pagbebenta, at kung naaangkop, ang na-schedule muli na oras at petsa sa bentahan ng ari-arian, maaari kayong tumawag sa , **(602) 412-5132**
(ang numero ng telepono para makakuha ng impormasyon hinggil sa pagbebenta ng trustee)
o bumisita dito sa Internet Web site address **WWW.NDSCORP.COM/SALES**
(Ang Internet website address para makakuha ng impormasyon hinggil sa pagbebenta ng ari-arian na ito)
gamit ang numero ng file na itinalaga sa kasong ito 15-21134-SP-CA Impormasyon
                                                        (numero ng file ng kaso)
tungkol sa mga pag-postpone sa loob ng maikling panahon o maaaring maganap kalapit ng na-schedule na pagbebenta ay maaaring hindi kaagad masaad sa impormasyon mula sa telepono o sa Internet Web site. Ang pinakamainam na paraan upang mapatotohanan ang impormasyon sa pag-postpone ay ang pagdalo sa naka-schedule na bentahan.

        Kung nais ninyo ng karagdagang mga kopya ng buod na ito, maaari ninyong makuha ang mga ito sa pamamagitna ng pagtawag sa **(602) 412-5131.**
                            (ilagay ang numero ng telepono)

Notice of Sale – Tagalong (Revised 12/18/12)

## THÔNG BÁO BÁN
### BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN CHÍNH

**Thông báo rao bán kèm theo được gửi tới cho Cynthia Holiday, an unmarried woman trong**
(Bên ủy thác)

mối quan hệ với 73-75 N First Street aka 75 N 1st St., Campbell, CA 95008
(mô tả căn nhà thế chấp cho khoản vay thế chấp mua nhà hoặc khế ước ủy thác bị vi phạm)

QUÝ VỊ VI PHẠM QUI ĐỊNH GHI THEO DEED OF TRUST NGÀY 11/09/2005
(kế ước ủy thác hoặc hợp đồng vay thế chấp mua nhà)
TRỪ KHI QUÝ VỊ CÓ HÀNH ĐỘNG BẢO VỆ CĂN NHÀ CỦA QUÝ VỊ, CĂN NHÀ CÓ THỂ BỊ BÁN
CÔNG KHAI.

NẾU QUÝ VỊ CẦN MỘT PHẦN GIẢI THÍCH VỀ TÍNH CHẤT CỦA THỦ TỤC CHỐNG LẠI QUÝ
VỊ, QUÝ VỊ NÊN LIÊN LẠC VỚI LUẬT SƯ.

Toàn bộ số tiền phải trả trong thông báo bán là $990,887.87

Căn nhà của quý vị được dự kiến sẽ bán vào  06/01/2017  10:00 AM  tại
(ngày và giờ rao bán)
At the Gated North Market Street entrance of the Superior Courthouse, 191 N First Street, San Jose,
CA 95113
(địa điểm bán)

Tuy nhiên, ngày bán ghi trong thông báo bán kèm theo có thể bị trì hoãn một hoặc nhiều lần
bởi bên cho vay thế chấp, người thụ hưởng, người được ủy quyền, hoặc tòa án, chiếu theo Mục
2924g của Bộ Luật Dân Sự California.  Luật pháp qui định thông tin về các trường hợp trì hoãn bán
nhà của bên được ủy quyền phải được cung cấp cho quý vị và công chúng, để cập nhật cho những
người không có mặt tại buổi rao bán. Nếu quý vị muốn biết ngày rao bán của quý vị có bị trì hoãn hay
không, và, nếu thích hợp, ngày giờ mới cho việc rao bán căn nhà này, quý vị có thể gọi
**(602) 412-5132**
(số điện thoại để biết thông tin về việc rao bán của bên được ủy thác)
hoặc tới địa chỉ Internet này **WWW.NDSCORP.COM/SALES**
(Địa chỉ Internet để biết thông tin về việc giao bán căn nhà đó) dựa trên mã số hồ sơ
được ấn định cho hộ này 15-21134-SP-CA.  Thông tin
(mã số hồ sơ)
về các trường hợp trì hoãn rất ngắn hoặc xảy ra ngay sát ngày rao bán dự kiến có thể không được
phản ánh ngay trong thông tin cung cấp qua điện thoại hoặc trên Internet.  Cách tốt nhất để xác minh
thông tin trì hoãn là tham dự buổi rao bán đã ấn định.

Nếu quý vị muốn có thêm bản sao của tài liệu trình bày tóm lược này, vui lòng gọi số
**(602) 412-5131.**
(ghi số điện thoại)

AVISO DE VENTA
RESUMEN DE LA INFORMACIÓN CLAVE

El aviso de venta adjunto se envió a Cynthia Holiday, an unmarried woman en relación con
(Fideicomitente)

73-75 N First Street aka 75 N 1st St., Campbell, CA 95008

USTED HA INCUMPLIDO LOS TÉRMINOS DE UNA DEED OF TRUST
(escritura de fideicomiso o hipoteca)

DE FECHA 11/09/2005
SI NO TOMA MEDIDAS PARA PROTEGER SU BIEN, PODRÁ SER VENDIDO EN UNA SUBASTA PÚBLICA.

SI NECESITA QUE LE EXPLIQUEN LA NATURALEZA DEL PROCEDIMIENTO EN SU CONTRA, DEBE CONSULTAR A UN ABOGADO.

El importe total adeudado correspondiente al aviso de venta es $990,887.87

La subasta del bien se ha programado para el día  at 06/01/2017 10:00 AM
(fecha y hora de la subasta)
en At the Gated North Market Street entrance of the Superior Courthouse, 191 N First Street, San Jose, CA 95113
(lugar de la subasta)

No obstante, conforme al Artículo 2924g del Código Civil de California, la fecha de la subasta que figura en el aviso adjunto podrá ser postergada una o más veces por el acreedor hipotecario, el beneficiario, el fideicomisario o un tribunal. La ley exige que, como cortesía para quienes no hayan asistido a la subasta, la información sobre las postergaciones solicitadas por el fideicomisario se ponga a disposición suya y del público en general. Si desea saber si la subasta de su bien se ha postergado, y, en tal caso, la nueva fecha propuesta para la subasta de este bien, puede llamar al teléfono **(602) 412-5132**
(número de teléfono para obtener información sobre la subasta del fideicomisario)

o visitar el sitio web **WWW.NDSCORP.COM/SALES**
(dirección del sitio web para obtener información sobre la subasta del bien)
para lo que debe contar con el número de registro asignado a este caso 15-21134-SP-CA
(número de registro del caso)
Es posible que la información sobre las postergaciones por plazos muy breves o decididas muy próximo a la fecha programada para la subasta no figuren en la información que se ofrece por teléfono o en el sitio web. La mejor forma de verificar la información sobre las postergaciones es asistir a la subasta que se ha programado.

Si desea recibir copias adicionales de este resumen, puede llamar al teléfono **(602) 412-5131.**
(ingresar número de teléfono)